[Criminal No. 308.   Filed July 15, 1912.]

[125 Pac. 878.]

FRANCISCO RODRIQUEZ, Appellant, v. TERRITORY OF ARIZONA, Respondent.

1. HOMICIDE — INDICTMENT — SUFFICIENCY.—An indictment charging murder must charge that the killing was unlawful, and was willful, deliberate, premeditated and with malice aforethought.

2. HOMICIDE—INDICTMENT—SUFFICIENCY.—Under Penal Code of 1901, section 824, which provides that an indictment must contain a statement of the acts constituting the offense in ordinary and concise language, and in such manner as to enable a person of common understanding to know what is intended, an indictment for murder, which avers that the defendant did "unlawfully, feloniously, willfully, and of his deliberate and premeditated malice aforethought make an as-

sault upon . . . with a certain pistol," and "did then and there willfully, unlawfully, feloniously, and of his deliberate and premeditated malice aforethought shoot off and discharge said pistol" and "inflict on, in, and upon the body and person of her . . . a mortal wound," from which she died, charges the killing with malice aforethought to a person of common understanding and is sufficient as against a demurrer.

3. JURY—SUMMONING—SPECIAL VENIRE—COMPETENCY OF JURORS SUMMONED.—Under the law prohibiting the sheriff from summoning bystanders as jurymen, jurors summoned upon the issuance of a special venire, though all from a single precinct of a county, were not therefor incompetent, as the law does not require that the jury shall be composed of residents of any particular district.

4. JURY—COMPETENCY—EXAMINATION.—In the examination of the trial jury on *voir dire* in a prosecution for murder, the court properly permitted the jurors to be questioned whether they believed that a killing which is murder may be surrounded by circumstances so as to make it the duty of the jury to return a verdict of murder in the first degree and fix the death penalty, and properly stated that it was the duty of the jury to return the death penalty under such circumstances as are included within the question.

5. CRIMINAL LAW—APPEAL AND ERROR—HARMLESS ERROR.—Though, in a prosecution for murder, upon objection to a question put by the district attorney on cross-examination of the defendant, the court improperly stated that "the district attorney would not ask such a question unless he had some means of proving it," it will not constitute ground for reversal, where, from the most favorable testimony of the defendant and bystanders, it is apparent that such defendant is guilty of murder.

6. CRIMINAL LAW—INSTRUCTIONS—REASONABLE DOUBT.—In a prosecution for murder, a charge on reasonable doubt, which contains the words, "No juryman has the right to say, 'I will say there is a reasonable doubt here,' for the purpose of avoiding his duty," immediately preceding, "unless a juryman does find that a reasonable doubt does exist, he is not to give the benefit of it to the defendant, but, if he does find that a reasonable doubt exists, then he is," could not have misled the jury as to its duty in finding the fact of guilt beyond a reasonable doubt, and was proper.

7. HOMICIDE—DEGREE.—That a man's wife left him and refused to live with him, and in the heat of passion, caused by her refusal to return, he killed her, will not reduce the degree of his crime.

APPEAL from a judgment of the District Court of the Third Judicial District, in and for the County of Maricopa. Edward Kent, Judge. Affirmed.

STATEMENT OF FACTS BY THE COURT.

At the April term, 1911, of the district court of Maricopa county, the grand jury returned an indictment against the appellant, charging him with the murder of Jesus M. Rodriquez, his wife. Omitting the formal parts of the indictment, the charge was made in the following words: "The said Francisco Rodriquez, on or about the 2d day of April, A. D. 1911, and before the finding of this indictment, at the county of Maricopa, territory of Arizona, did unlawfully, feloniously, willfully, and of his deliberate and premeditated malice aforethought make an assault upon one Jesus M. Rodriquez with a certain pistol, which said pistol was then and there loaded with gunpowder and leaden bullets, and which said pistol he, the said Francisco Rodriquez, then and there had and held in his hand, and the said Francisco Rodriquez did then and there willfully, unlawfully, feloniously, and of his deliberated and premeditated malice aforethought shoot off and discharge said pistol so loaded and held, as aforesaid, at, against, and upon the body and person of the said Jesus M. Rodriquez, and thereby, and by thus striking the said Jesus M. Rodriquez with one of said leaden bullets, inflict on, in, and upon the body and person of her, the said Jesus M. Rodriquez, a mortal wound, of which said mortal wound she, the said Jesus M. Rodriquez, did languish and languishing did then and there die on the 3d day of April, 1911, and within a year and a day from said 2d day of April, 1911. . . . "

To this indictment the defendant demurred upon the statutory grounds for demurrer, viz., that the indictment does not substantially conform to the requirements of sections 824, 825, and 826 of the Penal Code of Arizona, and that the facts in and by said indictment stated do not constitute a public offense, which demurrer was overruled by the court.

The defendant then entered his plea of not guilty. Defendant then interposed a challenge to the special venire of trial jurors, upon the ground that the jurors served by the sheriff in pursuance of the order of the court for such special venire were not summoned from the body of the county, but that all the jurors summoned upon the special venire are residents of and were served from Phoenix precinct of the county of Maricopa, which challenge the court denied.

Upon the trial had upon the issues, the jury returned a verdict of guilty of murder in the first degree and fixed the death penalty. The appellant filed a motion for a new trial, which motion was by the court overruled. Whereupon the court rendered its judgment and sentence in accordance with the verdict, and from which judgment, and from the order denying his motion for a new trial, the defendant appeals.

Messrs. Struckmeyer & Fisher and Mr. J. L. Gust, for Appellant.

Mr. G. P. Bullard, Attorney General, for Respondent.

CUNNINGHAM, J.—The appellant contends that the indictment is not sufficient to support a verdict and judgment of murder in the first degree, and alleges that it does not charge a willful, deliberate, and premeditated killing of a human being with malice aforethought. If this objection is well founded, the conviction was wrong, and the judgment of the court must be reversed.

It is said by the supreme court in the case of *United States* v. *Cruikshank*, 92 U. S. 558, 23 L. Ed. 593: "The object of the indictment is, first, to furnish the accused with such a description of the charge against him as will enable him to make his defense and avail himself of his conviction or acquittal for protection against a further prosecution for the same cause; and, second, to inform the court of the facts alleged, so that it may decide whether they are sufficient in law to support a conviction, if one should be had. For this, facts are to be stated, not conclusions of law alone. A crime is made up from facts and intent, and these must be set forth in the indictment with reasonable particularity of time, place and circumstances."

Under the statutes of Arizona, the indictment must contain the title of the court and a statement of the facts constituting the offense in ordinary and concise language, and in such manner as to enable a person of common understanding to know what is intended. Sec. 824, Pen. Code Ariz. 1901.

The indictment must be direct and certain as regards the party charged, the offense charged, the particular circumstances of the offense charged, when they are necessary to constitute a complete offense. Sec. 826, Pen. Code Ariz. 1901.

The indictment is sufficient if it can be understood therefrom that it is entitled in a court having authority to receive it; that it was found by a grand jury of the county in which the court was held; that the defendant is named; that the offense was committed at some place within the jurisdiction of the court; that the offense was committed at some time prior to the finding of the indictment; that the act or omission charged as the offense is clearly and distinctly set forth in ordinary and concise language, and in such manner as to enable a person of common understanding to know what is intended; that the act or omission charged as the offense is stated with such degree of certainty as to enable the court to pronounce judgment upon a conviction, according to the right of the case. Sec. 833, Pen. Code Ariz. 1901.

No indictment is insufficient, nor can the trial, judgment, or other proceeding therein be attacked, by reason of any defect or imperfection in matter of form which does not intend to prejudice a substantial right of the defendant upon its merits. Sec. 834, Pen. Code Ariz. 1901.

Murder, as defined by our law, is "the unlawful killing of a human being with malice aforethought. Such malice is expressed or implied. It is expressed when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature. It is implied where no considerable provocation appears or where the circumstances attending the killing show an abandoned and malignant heart." Sec. 172, Pen. Code Ariz. 1901.

All murder which is perpetrated by means of poison, or lying in wait, or by any other kind of willful, deliberate, and premeditated killing, or which is committed in the perpetration of or attempt to perpetrate arson, rape, robbery, burglary, or mayhem, is murder of the first degree, and all other kinds of murder are of the second degree. Sec. 173, Pen. Code Ariz. 1901.

In order that the conviction may stand in this case, the indictment must charge that the killing was unlawful and with malice aforethought, and that such killing was willful, deliberate, and premeditated. It is contended by appellant that this indictment charges a willful, unlawful and felonious assault with deliberate and premeditated malice, and that the charge is not equivalent to an averment of willful, unlawful

and premeditated killing; for the latter necessarily implies the existence of the intent with the means of inflicting death, which intent may be lacking in assault, and is not averred, and cites authorities that seem to sustain this view.

In the case of *Fitzpatrick* v. *United States*, 178 U. S. 304, 44 L. Ed. 1078, 20 Sup. Ct. Rep. 944, the supreme court deals with an indictment very smilar in form to the one returned against this appellant; the indictment in that case, omitting the immaterial parts, reading as follows: "Did unlawfully, willfully, knowingly, feloniously, purposely, and of deliberate and premeditated malice make an assault upon one Samuel Roberts and that they . . . a certain revolver then and there charged with gunpowder and leaden bullets, . . . then and there feloniously, purposely, and of deliberate and premeditated malice did discharge and shoot off to, against, and upon the said Samuel Roberts; . . . with one of the bullets aforesaid, out of the revolver, aforesaid . . . discharged and shot off as aforesaid then and there feloniously, purposely and with deliberate and premeditated malice did strike, penetrate, and wound him, the said Samuel Roberts, in and upon the right breast . . . one mortal wound, of which said mortal wound he, the said Samuel Roberts, instantly died," and further "did then and there kill and murder the said Samuel Roberts in the manner and form aforesaid."

The supreme court comments upon this indictment as follows: "Defendant criticises this indictment as failing to aver deliberate and premeditated malice in killing Roberts, although it is averred that the defendants did, with deliberate and premeditated malice, inflict a mortal wound, of which he instantly died, and that they killed and murdered him in the manner and form aforesaid. If, as alleged in the indictment, they, with deliberate and premeditated malice, shot Roberts in the breast with a revolver, and inflicted a mortal wound, of which he instantly died, they would be presumed to contemplate and intend the natural and probable consequences of such act; and an additional averment that they, with deliberate and premeditated malice intended to kill him, was quite unnecessary to apprise the common understanding of their purpose. If they purposely inflicted a mortal wound, they must have intended to kill. No person could have a moment's hestitation as to what it was intended

to aver, viz., that the defendants had been guilty of a deliberate and premeditated murder; and while a number of cases are cited which lend some support to the argument of the defendant, there was no such statute involved as section 1268 of the Oregon Code. We have no doubt the indictment furnished the accused with such a description of the charge as would enable him to avail himself of a plea of former jeopardy, and also to inform the court whether the facts were sufficient in law to support a conviction, within the ruling in the Cruikshank case. While we should hold an indictment to be insufficient that did not charge in definite language all the elements constituting the offense, we have no desire to be hypercritical or to require the pleader to unduly repeat as to every incident of the offense the allegation of deliberateness and premeditation. We are bound to give some effect to the provisions of section 1268 in its evident purpose to authorize a relaxation of the extreme stringency of criminal pleadings, and make that sufficient in law which satisfies the 'common understanding of men.' ''

By Hill's Annotated Laws of Oregon, section 1268, relating to criminal procedure, an indictment must contain: ''1. The title of the action, specifying the name of the court to which the indictment is presented, and the names of the parties. 2. A statement of the acts constituting the offense in ordinary and concise language, without repetition, and in such manner as to enable a person of common understanding to know what is intended.''

We think the Fitzpatrick case, controlled by the Oregon statute quoted, is a sufficient authority for us to hold, and we do hold, that the indictment in this case is sufficient to enable a person of common understanding to know what is intended by the language used; and it would be absurd to hold that, because the indictment does not repeat the words ''willful, deliberate, and premeditated'' before every clause in the charge, therefore the indictment does not charge murder in the first degree. To the same effect is *Davis* v. *Utah,* 151 U. S. 262, 38 L. Ed. 153, 14 Sup. Ct. Rep. 328, containing an identically worded statute with ours and the statute of California. To the same effect is *People* v. *Davis,* 73 Cal. 355, 15 Pac. 8.

In *People* v. *Martin,* 47 Cal. 102, the indictment averred that the defendants "willfully, unlawfully, feloniously, and of their malice aforethought, in and upon one Valentine Eichler, did make an assault, and with an ax, in and upon the head of said Valentine Eichler, then and there feloniously, willfully, and of their malice aforethought, did strike and beat, giving to said Valentine Eichler, then and there, and with an ax aforesaid, . . . divers mortal wounds, of which the said Valentine Eichler instantly died," contrary, etc. The indictment was held good, notwithstanding it did not conclude with the words in the effect, "and so the grand jury say that the defendants, the said Valentine Eichler, in manner and form aforesaid, feloniously willfully, and of their malice aforethought did kill and murder," contrary, etc. That case holds that, if the indictment charges that the defendant "feloniously, willfully, and of his malice aforethought" inflicted the mortal wound of which deceased died, it is sufficient. *People* v. *Martin,* 47 Cal. 101; *People* v. *Steventon,* 9 Cal. 274; *People* v. *Ybarra,* 17 Cal. 170; *People* v. *Nichol,* 34 Cal. 211.

This indictment charges that the defendant did "unlawfully, feloniously, willfully, and of his deliberate and premeditated malice aforethought, make an assault upon Jesus M. Rodriquez with a certain pistol," and "did then and there willfully, unlawfully, and feloniously and of his deliberated and premeditated malice aforethought shoot off and discharge said pistol so loaded" and "inflict on, in, and upon the body and person of her, the said Jesus M. Rodriquez, a mortal wound," from which wound she died. From this language no person of common understanding could be mistaken as to what charge was intended to be made against the defendant.

We do not wish to be understood as approving the form in which the indictment in this case is drawn, as the form is very unsatisfactory as a pleading; but section 834 of the Penal Code of Arizona 1901 requires that "No indictment is insufficient, nor can the trial, judgment or other proceeding thereon be affected by reason of any defect or imperfection in matter of form which does not tend to the prejudice of a substantial right of the defendant upon its merits"; and we hold that the indictment is sufficient in form, and does not tend to prejudice

any substantial right of the defendant upon the merits of the case.

The appellant objects to the manner in which the special venire was issued, requiring the same to be returned upon short notice, thus preventing the sheriff from going into the outer precincts of the county and summoning jurors. The objection of the appellant that the jurymen were summoned from Phoenix precinct is untenable, as the law does not require that a jury shall be composed of residents of the districts or any particular district of the county, but prohibits the sheriff from summoning bystanders only.

Appellant complains that upon the examination of the trial jury upon their *voir dire* the court permitted the following question: "Q. In other words, then you believe that a killing which is murder may be surrounded by such circumstances as to make it the duty of the jury to return a verdict of murder in the first degree and fix the death penalty and hang the defendant?" And in this connection appellant claims that the court stated that it was the duty of the jury to return the death penalty under such circumstances as are included within the question above. We think the question was proper, and that the statement of the court is the law of Arizona, and that no substantial injury was done to the defendant by the language complained of.

Appellant complains of a question permitted upon cross-examination of the defendant, viz.: "And yet, Rodriquez, not two weeks before you shot her, you dragged her around with a knife in your hand, didn't you?"—and complains that the court, in overruling his objection to the question, commented improperly before the jury in the following language: "The district attorney would not ask such a question, unless he had some means of proving it." The question asked by the prosecution may or may not have been proper, but the statement of the court while making his ruling upon the objection seems to be highly improper. It is well known that jurors often regard the opinion of the court upon the evidence as having very great weight in their deliberations, and in many instances such remarks are the turning points upon which verdicts are reached. If the evidence in this case appeared to be close, giving room for a doubt as to the guilt or innocence of the defendant, or as to the degree of guilt, we would con-

sider the remark of the court as extremely damaging to the rights of the defendant. Upon this phase of the case, we will consider the testimony of the defendant himself, and the testimony given by the surgeon who examined the deceased, and the testimony of one of the witnesses who saw the killing, as the most favorable presentation of the case in behalf of the defendant.

The defendant testified: ''On the 1st of April, 1911, I bought a gun, a pistol. I don't know why I bought it. I know I used to have a gun with me all the time in my pocket, and I had a gun and lent it to a friend of mine, and he took it away, and I went and bought this gun. I don't remember my friend's name. He used to live in Tucson. If I saw his face, I would know him. The greater part of the evening I was in saloons drinking until the saloons closed up.

''I was living at the Star Lodging-house, and when I left the saloons I went to the room. I bought three bottles of beer and a couple of pints of whisky. I took them to my room, and I drank them the next morning, April 2d. That morning I got up at half-past seven and went to a place where I used to get my board, and got my breakfast. Before I had my breakfast, I had a bottle of beer. After breakfast, I came back to the room again. I made a letter, and then drank the other bottle of beer. After I made the letter, I came down-town, because my wife came to the room and called me outside and said she wanted to see me. I went downtown with her. We came down and walked around in the streets, and then I took her back to the candy-store—I don't know the name of it—and left her there, and went over and mailed the letter. On the road to the postoffice, I met a boy named Bill, but I don't remember his last name. They called him Billy. He was a plumber's helper. He was working for Mr. Mulrain while I was working for Mr. Mulrain. We had worked together at the same shop and on the National Bank of Arizona building. After I met Billy, I went across from the postoffice to a stationery store and bought a big envelope. Billy was with me, and he was waiting outside for me on the other sidewalk, and then I went in there and bought the envelope, and then I mailed the pictures and letter and took them to the postoffice, and the postoffice was closed, you know, and I just mailed the letter and came back to the stationery store

and told the fellow to mail the pictures for me, and he said, 'All right, I will mail them for you.' And I left with Billy, and he and I come to my room and drank the other bottle of beer and some whisky I had there. We got back to the room about half-past nine and stayed about ten or fifteen minutes. We drank the bottle of beer and pint of whisky, and then he and I come downtown together, and then I left him on the corner of Center and Washington, and then I had forgot all about my wife, and I went to the candy-store and got my wife; she was waiting there for me. Then we came down here out this way, walking on the sidewalk there, and then we went back again.

"We were talking together, and she asked me for some money. I told her I had some money in my room, and then she said, 'I want to go with you to your room to give me those pictures that you have there that belong to me.' And she asked me to go there and get it for her, and her and I went there together. A pair of drawers and a pair of hose I had there were talked about. She took my laundry one day, and when she sent me that laundry back she sent that pair of drawers and laundry to me. She did some laundry for me, and she sent the washing back with the laundry mentioned. She asked me to come back with her, and I said, 'All right,' and she went there with me, and I gave it back to her. I went to the room and got another pint of whisky and put it in my pocket, and then got the revolver and put it in my pocket too. The only reason I had for putting the pistol in my pocket was that I had in my mind for a long time, you know, was that I could not stay away from her. I used to love her pretty good, you know. I don't remember what I put the pistol in my pocket for; but I put it in my pocket and came out. I wrapped a piece of paper around the clothes and gave the package to her. She took the package with her. I don't remember whether I gave her any money. I was pretty drunk, but I think I gave some to her, but I don't remember sure.

"From the Star Lodging-house I walked up with her to where the schoolhouse is there, and then came back again to where the railroad track is, and then back out that street that way toward the east until we came to the corner. I don't know the name of the street, but I think the same street they

have on the plan there, but I am not sure.  I was talking to her, and asked her if she wanted to come back to me, and she said, 'No'; she was living at home.  And all the time I used to tell her to come back to me, and I told her, 'Why don't you come back to me again?' and she told me her folks didn't want her to come back to me again, and they used to make all kind of fun of her that she didn't want to come back to me.  And then you know she said to me she was going to get a divorce, and I said to her, 'You better get a divorce if I want it.'  And she said: 'I don't care if you want it, but I will get it all the same.'  And then she turned around and started to laugh at me, you know, and then when she turned around she said to me: 'You can do whatever you please with me, but I won't come back to you.'  Well, I was so angry I don't remember.  I was kind of blind.  I don't remember what I done after that.  I know I shot her.  My memory is not clear as to what I did.  I was excited.  I cannot understand English very well, and I cannot talk good English.  I remember well what took place.  I remember distinctly the things I did, and that she said she won't come back to me again; won't live with me again.

"I heard the testimony of Col. Johnstone, and I made the statement substantially as testified to by him."  (The question was asked by Dr. Orme: "Frank, why did you kill your wife" or "Did you kill your wife?"  He answered: "I did, and I am glad of it.  I loved her, and I am ready to hang for it"—or something equivalent to that.  I think he used the word "hang.")  "I told the judge and everybody that was there that I killed my wife because I loved her with all my heart, you know, and I could not stay away from her, and I didn't want to see her with anybody, and don't want her to make laugh at me.  I didn't buy the pistol on Saturday night with intention to kill my wife.  I bought it to keep with me all the time.  I don't remember how many shots I fired at her.  I think they took the gun away from me.  I was so excited I don't remember.  After the shooting I ran toward Washington street; then I ran to Madison street; then I turned around toward Washington street.  They claim that two weeks before I shot her I dragged her around with a knife in my hand, but it is not true.  I saw her not over two weeks before, I plead guilty in the justice court, but I never had

XIV Ariz.—12

a knife in my hand. My wife begged to have the charge reduced from a felony to a misdemeanor. I know the judge agreed to. I shot her because I loved her. I didn't want her to make any laugh out of me. I didn't want to see her with anybody else. It was my way of showing my love for her. I told Sheriff Hayden that I knew my wife was true to me, and she was. I don't remember if I shot her in the back or not. I was so angry at the time I didn't know how I shot her. I was not very drunk at the time I shot her. I knew what I was doing.''

Willard Smith testified that he examined the deceased, and found that she had received five gunshot wounds. One bullet entered the chest from behind just below the right shoulder blade; one entered the chest from behind just below the left shoulder blade; one entered the abdomen from in front below the ensiform cartilage, a little to the right, and followed a course downward and outward and backward, and emerged in the right hip; one was through the fleshy part of the left hand; and one in the left thigh.

Margaret Sasueta testified that she saw the defendant and his wife on Ninth street, between Jackson and Madison streets, about half-past twelve. ''They were conversing when I first saw them. I heard her call for help, and he was running after her and shooting her. I saw him shooting her right in the middle of the back. I could see the revolver. Then she fell, and then he shot her. I don't know how many times he shot her. Then she fell on her knees, and she raised her hands facing him. He was standing about two feet from her. When he gave her the last shot, he said, 'So that you may believe it.' I heard it plain. He said that when he fired the last shot.''

The other witnesses who saw the difficulty testified substantially to the same state of facts.

Upon the evidence set out above, we are unable to see where the substantial rights of the defendant have been prejudiced by the court in making the remark of which appellant complains. The error, we believe, was without prejudice to any substantial right of the appellant.

The same rule applies to the fifth assignment of error. The last complaint made by the appellant is to a charge to the jury reading as follows: ''Unless a juryman does find that a rea-

sonable doubt does exist, he is not to give the benefit of it to
the defendant.'' The language of this instruction, as quoted,
seems awkward; but, when considered in connection with the
other language leading up to it, it is explained, and no mis-
take was made by the court in using such words. The court,
in his charge to the jury in this connection, says: ''By rea-
sonable doubt, gentlemen, is not meant a captious or imagi-
nary doubt. It does not mean a doubt by which the juryman
may say, 'I will take that as an excuse for not finding the ver-
dict I think I ought to do.' A reasonable doubt, as used in
the law, means just exactly what it says. There is no better
definition than the words themselves, 'a reasonable doubt.'
No juryman has the right to say, 'I will say there is a reason-
able doubt here,' for the purpose of avoiding his duty. Un-
less a juryman does find that a reasonable doubt does exist, he
is not to give the benefit of it to the defendant, but, if he does
find a reasonable doubt that exists, then he is.'' The instruc-
tions, when taken together, cannot be held to have misled the
jury as to its duty in finding the fact beyond a reasonable
doubt, in view of the testimony quoted above.

The evidence offered by the defendant is not sufficient to
reduce the homicide from murder in the first degree, unless
we hold that the heat of blood produced in the mind of the
appellant by the deceased refusing to live with him, and his
love for deceased, provoked such a passion as, in law, would
amount to a mitigation of the crime. This we are not pre-
pared to admit. This court is not prepared to say that be-
cause the wife of a man refuses to live with him that he has
the right, under our law, to take her life, to prevent her from
securing a legal separation and thereafter becoming the wife
of some other man. Jealousy is a motive for crime, not an
excuse for it. And where a man, by all the obligations of
civilization, government, and religion, has taken the most
solemn vow that man can take in the presence of earthly wit-
nesses and his Maker that he will love, support and protect
his wife, because for any reason his wife prefers to live sep-
arate and apart from him, that he would be justified in re-
nouncing his marital vows and in taking the life of the one
he has sworn to protect is a position this court does not want
to assume. Barbaric practices in treating the wife as a chat-
tel and brain-storms are not recognized by this court as ex-

cuses, under the laws of Arizona, for committing a crime, nor are they recognized in mitigation of the punishment.

We find no substantial right of the defendant violated in the trial, and no reversible error committed by the trial court. We therefore affirm the judgment of the trial court, and direct that the cause be remanded to the superior court of Maricopa county, state of Arizona, and that the sentence and judgment of the district court of the third judicial district of the territory of Arizona in and for the county of Maricopa be by said superior court enforced according to law.

FRANKLIN, C. J., and ROSS, J., concur.

---

NOTE.—As to instructions on "reasonable doubt," see notes in 48 Am. St. Rep. 566; 11 Ann. Cas. 433, 1019.

As to the examination of jurors on *voir dire*, see notes in 23 Am. Dec. 128; 109 Am. St. Rep. 563.

As to the condition of mind which reduces murder to manslaughter, see note in 134 Am. St. Rep. 726.