[Criminal No. 458.    Filed March 31, 1919.]

[179 Pac. 647.]

## J. R. BEASLEY, Appellant, v. STATE, Respondent.

1. HOMICIDE—MURDER—SELF-DEFENSE—SUFFICIENCY OF EVIDENCE.—In prosecution for murder defendant's statement in connection with other evidence *held* insufficient to support defendant's plea of self-defense.

2. HOMICIDE—MOTIVE—EVIDENCE ADMISSIBLE.—In prosecution for murder, evidence that deceased had put up notices and placed a house on the land in dispute between him and relatives of defendant was admissible to show motive.

3. CRIMINAL LAW—CONDUCT OF JUDGE—COMMENTS ON EVIDENCE.— Where judge, in ruling upon admission of testimony tending to show motive for the killing, stated to counsel, "I would want him to show anything that would show motive for the crime as he claims in the avowal, and I think I'll permit him to make this showing at this time," his remarks *held* not to be comments on the facts, prohibited by Constitution, article 6, section 12.

4. CRIMINAL LAW—COMMENTS BY JUDGE—CONSTITUTIONAL PROVISIONS —INTENT AND POLICY.—Constitution, article 6, section 12, providing that judges shall not charge the jury with respect to matters of fact nor comment thereon, but shall declare the law, is intended to prevent comments on the facts in giving instructions by which the jury are to be guided, and at a time when such comments would tend to affect their minds, and is not intended to prevent judges from giving counsel the reasons for their rulings on the admission or rejection of testimony.

5. CRIMINAL LAW — EVIDENCE — HEARSAY—HOMICIDE.—In prosecution for murder, where defendant sought to prove that he carried a weapon at the time of the killing, because he was afraid of a third party, who had slandered his daughter, testimony as to statements made by such third party as to his relations with defendant's daughter *held* inadmissible as hearsay.

6. CRIMINAL LAW—APPEAL—TECHNICAL ANALYSIS OF INSTRUCTIONS.— The practical administration of justice should not be defeated by a too rigid adherence to a close and technical analysis of the instructions of the court.

[As to general nature of self-defense, see note in 109 **Am. St. Rep.** 805.]

APPEAL from a judgment of the Superior Court of the county of Maricopa. R. C. Stanford, Judge. Judgment affirmed.

Mr. M. T. Phelps and Mr. George P. Stovall, for Appellant.

Mr. Wiley E. Jones, Attorney General, for the State.

BAKER, J.—The defendant, J. R. Beasley, shot and killed John W. Bell on the ninth day of June, 1917. He was informed against in the superior court of Maricopa county for murder, and was convicted of murder in the first degree and sentenced to life imprisonment in the state prison, and he appeals from the judgment and order overruling his motion for a new trial.

Error is assigned upon the rulings of the court in the admission and rejection of testimony, misconduct of the judge, and in giving instructions to the jury and refusing to give requested instructions to the jury, and, finally, it is objected that the testimony was insufficient to warrant or sustain the verdict. The last contention will first be noticed.

The voluntary killing was admitted, but the claim was made that it was done in self-defense. This plea is based mainly upon the testimony of the defendant himself; there being no one present at the homicide except the defendant and the deceased. It appears that the Southwest Cotton Company employed the deceased to remove a lot of baled hay from the premises occupied by the defendant, which the company had purchased from the defendant, and that on the morning of June 9, 1917, about seven o'clock, the deceased went to where the hay was stacked with a wagon and team, and commenced loading the hay upon the wagon. He was using ordinary hay-hooks in the work. The defendant at the time was at his house something like a quarter of a mile away, and saw the deceased and the wagon and team. He claims that he did not recognize the deceased at that time, having only seen him upon two former occasions. The defendant went to where the deceased was working, being armed at the time with a pistol, but he claims that his object in going there was to ascertain how the work of removing the hay was progressing, that he might get ready to irrigate the land. He also claims that he had been carrying the pistol for some time because a certain man had slandered one of his daughters, and that the man was a pugilist and was always fighting. The narrative of the defendant as to what occurred when he reached the place where the deceased was, is substantially as follows:

"I bid him [the deceased], 'Good morning,' and he replied, 'Good morning,' I asked him how they were getting along hauling hay, and he replied, 'All right, he guessed.' I asked him how many wagons were hauling, and he replied, 'Four.' I got on the stack to observe its dimensions. After getting on the stack, the deceased said, 'This is good hay,' and I replied, 'Yes; pretty good hay.' I asked him, 'How many bales do you haul to the load?' and he said, 'One hundred,' and I said, 'That is a big load of hay.' I did not know certainly that it was Bell until he made the remark, 'You didn't hunt me up Monday or Tuesday.' He had reference to what he had told Charlie Beckman about being in Chandler on Monday and Tuesday. I told him, 'No'; that I didn't think it was any use; that he didn't do what he said he would do. I told him that he had told Charlie Beckman that, if I had the receipts of my children for money showing that they had filed on the land, that he would not move his family on it, and he hadn't done it. He said that he had not told Charlie Beckman that, and I told him that he was a liar; that he did do it. He replied, 'Don't call me a liar, or I will kill you,' and he started at me with the hay-hooks. At the time he said this he had just placed a bale of hay at the farthest edge of the wagon at the front. At the time he started to me he had a hay-hook in each hand held up, the points turned forward as if handling hay. He was leaning forward; he was coming pretty pert toward me. I started to get out of the way and stepped back, and my left foot went between two bales of hay and became fastened. I jerked my gun and went to shooting; I was afraid of him; afraid he would tear me up or kill me with the hay-hooks. I would say I fired three or four times. When I was firing, I did not observe the effect of the shots; I was too excited. He fell over the north edge of the hay frame. After he fell I saw him kicking, and I walked up and down two or three times and then went to the house."

Such, in substance, is the statement of the defendant as to how the homicide took place. Were the jury bound to accept the statement as the truth? It is contended by the prosecution that, not only were the jury free to reject the testimony of the defendant in his own favor, but they were justified in so doing by various circumstances wholly inconsistent with the facts as testified to by him, and by discrepancies in his testimony, as well as by the inherent

improbability of the truth of his statements and contradictions of his testimony arising from other facts and circumstances proven in the case.

The theory of the prosecution is that, on account of the fact that the deceased had "jumped" the land in dispute between the deceased and the son-in-law and daughter of the defendant, the defendant deliberately resolved to kill the deceased in revenge, and that he went to where the deceased was at work, armed with a pistol, and shot him to death; and that, in order to give the killing the appearance of an act of self-defense, he arranged and contrived the circumstances upon which he now relies to give an air of plausibility to his account of the fatal affair.

It is in evidence that the deceased had squatted upon the piece of public land claimed by the son-in-law and daughter of the defendant, and upon which they had made filings in the United States land office, but that such filings had been rejected, and the matter was upon appeal at the time of the homicide; that the defendant had, at least upon one occasion, held an interview with the deceased, in which interview he claims that the deceased promised that, if he could show the receipts of his children for money paid for filing upon the land, that he (the deceased) would not move his family on the land, and that the deceased had not kept his promise. When the deceased made denial that he had made any such promise, the defendant called him a liar. Here is evidence from which the jury might conclude that the defendant bore malice toward the deceased and had a motive for the killing. It also justified the jury in finding that the defendant provoked the difficulty he testifies to, and that he brought on the alleged necessity for the killing of the deceased.

The wounds upon the body of the deceased utterly refute the statement of the defendant that he shot the deceased while the deceased was in the act of assaulting him with the hayhooks, and justified the jury in believing that the deceased was shot from the rear and not from the front. There were three wounds upon the body of the deceased. The aperture of one wound was about two inches below the right corner of the right eye and one inch above, and the other aperture of this wound was through the right eye. The expert testimony as to this wound justified the jury in concluding that the shot entered behind the right corner of the right eye

and came out through the eye.   Another wound was through
the head of the deceased, with one aperture behind and below
the lobe of the left ear, and the other aperture was through
the right forehead about two inches above the right eye.   The
expert testimony as to this wound tended to show that the
shot entered behind the left ear and had its exit in the right
forehead.   The third wound was through the upper left fore-
arm, one aperture thereof posterior and about three inches
below the shoulder joint, and the other anterior and about
one inch below the shoulder joint.   The expert testimony
tended also to show that this shot was fired from the rear of
the deceased.   The jury must have concluded that each one
of these shots was fired at the deceased while his back was
turned, or partially turned, to the defendant, and we cannot
say that they were not justified in such conclusion.

The explanation of the defendant that upon the occasion
of the homicide he was carrying the pistol, for the reason
that his daughter had been slandered by someone who had the
reputation of being a pugilist must have been wholly unsatis-
factory to the jury.   The killing took place early in the morn-
ing upon the premises of the defendant.   There was appar-
ently no reason whatever for him to think that the man who
had slandered his daughter was upon his premises, or that
he was at all likely to come in contact with him at the time.

We have by no means made an exhaustive review of all
the testimony in the case, it being impracticable to do so;
but we have, nevertheless, carefully examined the evidence,
and, while we cannot help regarding several of the theories
of the prosecution in respect to the motives and acts of the
defendant as fanciful and unfounded, we are at the same time
convinced that it cannot be held, as a matter of law, that
there is no evidence to support the verdict.

It is assigned as error that the prosecution was permitted to
prove that the deceased had put up notices on the piece of land
in dispute between him and the son-in-law and daughter of
the defendant, and had placed a house upon the land, and
that at the time of posting these notices and placing the house
on the land there were no other notices posted on the land.
This evidence was admissible for the purpose of showing
that the defendant had a motive for killing the deceased.
The merits of the controversy or dispute about the land were

immaterial it is true, but we think the testimony went only to the extent of establishing the motive.

Another assignment of error is based upon the fact that the court, in ruling upon the admission of testimony tending to show motive, said:

"I would want him to show anything that would show motive for the crime as he claims in the avowal, and I think I'll permit him to make this showing at this time."

These remarks, it is said, are comments on the facts within the meaning of section 12, article 6, of the state Constitution, which is as follows:

"Judges shall not charge the jury with respect to matters of fact nor comment thereon, but shall declare the law."

This court has held that a violation of this provision by the trial court necessitates a reversal of the judgment. *Merino* v. *State,* 16 Ariz. 132, 141 Pac. 710; *Lujan* v. *State,* 16 Ariz. 123, 141 Pac. 706. In both of these cases the objectionable remarks were addressed to the jury in giving instructions, and hence were literally violative of the mandate of the Constitution. In the case at bar the remarks objected to were addressed to the counsel, and we do not think the provision of the Constitution quoted was intended to prevent judges from giving counsel the reasons for their rulings upon questions concerning the admission or rejection of testimony. We do not, however, wish to be understood as holding that a judge, under this provision, is at liberty in addressing counsel to comment upon the facts in the presence of the jury in a way calculated to influence their verdict. Yet it is manifest from the language of the provision that its primary object was to prevent comments on the facts in giving instructions by which the jury are to be guided, and at a time when such comments would be likely to affect their minds. Strictly speaking, we do not think the remarks quoted really amount to a comment upon the facts. The judge was simply giving the counsel his reasons for overruling the objection to the testimony and, in doing so, incidentally used the words "crime" and "motive."

Assignments 6, 7 and 8 are based upon the refusal of the court to allow certain witnesses to testify to the effect that one Pete Russell had stated that he had had sexual intercourse with one of the defendant's daughters, and that the defendant had been informed of the statement made by the said Pete

Russell. We cannot possibly conceive how this testimony was admissible for any purpose. It is purely hearsay, and constitutes no defense whatever. If Russell was a pugilist and a fighter as claimed by defendant, it nowhere appears that he had made any threats against the defendant, or that the defendant was in any danger at his hands.

It will serve no useful purpose to enter upon an extended discussion of the objections to the instructions given by the court to the jury. Many of these objections are hypercritical, and place a strained construction upon the charge not warranted by the language used. Doubtless some of the instructions might have been improved to their advantage in clearness, but we see no error sufficient to justify a reversal of the judgment. The practical administration of justice should not be defeated by a too rigid adherence to a close and technical analysis of the instructions of the court. They are for the enlightenment of the jury as to the law of the case, and a jury never enters into such character of analysis in construing them. Nor do we find any reversible error in the refusal of the court to give the instructions requested by the defendant.

After a careful review of the whole record, we are constrained to believe that the defendant had a fair and impartial trial, and that substantial justice has been done in the case.

The judgment is affirmed.

CUNNINGHAM, C. J., and ROSS, J., concur.