[Criminal No. 462.   Filed June 18, 1919.]

[182 Pac. 96.]

## IVAL McCANN, Appellant, v. STATE, Respondent.

1. HOMICIDE—CORPUS DELICTI — EVIDENCE—SUFFICIENCY.—In a prosecution for homicide, evidence although wholly circumstantial, *held* sufficient to establish the *corpus delicti*.

2. HOMICIDE—EVIDENCE—SUFFICIENCY.—In a prosecution for homicide, evidence *held* sufficient to carry to the jury the question whether defendant was guilty of the crime charged.

3. CRIMINAL LAW—EVIDENCE—STATE'S CASE IN CHIEF.—In a homicide case, evidence of statements made by the accused out of court may be shown as a part of the state's principal case.

4. CRIMINAL LAW — WITNESSES — REBUTTAL — CROSS-EXAMINATION — STATEMENTS BY DEFENDANT.—Though statements made by accused out of court concerning the homicide were admissible as part of the state's case in chief, accused, where he took the stand and denied statements, may be cross-examined as to such statements and they may be offered in evidence in rebuttal.

5. WITNESSES—BIAS—REBUTTAL.—Where a witness against accused testified that he had not been on good terms with accused recently, it is proper, for the purpose of explaining bias or ill feeling, to inquire into the cause without going into details.

6. CRIMINAL LAW—APPEAL—HARMLESS ERROR—EVIDENCE.—In a prosecution for homicide, where one of the state's witnesses testified that he had not been on good terms recently with defendant, and, when asked on redirect examination as to the cause, stated that he had come to the conclusion that defendant was guilty, and told him so, the overruling of an objection to the question was harmless, where the court promptly struck out the answer, and instructed the jury to disregard the expression of opinion.

7. HOMICIDE—INSTRUCTIONS—ACCESSORIES.—The fact that deceased's skull showed that he had been shot with bullets of different calibers does not, without more, warrant an instruction with respect to the abolition of the distinction of accessories before the fact and principals, found in Penal Code of Arizona of 1913, section 27.

8. CRIMINAL LAW — REVIEW — HARMLESS ERROR — INAPPLICABLE INSTRUCTIONS.—The giving of instructions correct in law, but having no basis in the evidence, while technically erroneous, is not reversible error, unless there is some reason to believe prejudice resulted.

9. CRIMINAL LAW—TRIAL—INSTRUCTIONS—DEFENDANT'S TESTIMONY.— In a prosecution for homicide, where some of the witnesses for the

state were on cross-examination asked as to statements made at the preliminary examination, claimed to conflict with their testimony at trial, *held,* that an instruction that, if the jury believed that any witnesses at a time prior to trial made voluntary admissions in regard to material issues, and such admissions were in conflict with the evidence given at trial, such conflict might be considered by the jury on the question of credibility, was not erroneous, as singling out and directing the attention of the jury to the testimony of defendant, which the state claimed conflicted with his statements prior to trial.

10. CRIMINAL LAW — INSTRUCTIONS — OPINION AS TO DEFENSE.—In a homicide case, where defendant relied on *alibi,* an instruction that defendant "sought" to prove an *alibi,* by which was meant he was "some place else at the time the crime occurred," and that, if the evidence on *alibi* raises a reasonable doubt, defendant should be acquitted, but that his "attempt" to prove an alibi does not shift the burden of proof, *held* not erroneous.

11. CRIMINAL LAW — INSTRUCTIONS — DEFENDANT'S TESTIMONY.—In a homicide case, where defendant took the stand, an instruction directing particular attention to his testimony was improper.

12. CRIMINAL LAW—APPEAL — HARMLESS ERROR—INSTRUCTION.—In a homicide case, where defendant took the stand, an instruction that his testimony was presumptively true, etc., while improper, *held* harmless.

13. JURY—DISQUALIFICATION OF JUROR.—The mere fact that a juror was one of a number of a party conducting a search for the body of deceased after his disappearance *held* not to disqualify him; it not appearing that anything was said or done by the juror which would prejudice him for trial of the case.

14. CRIMINAL LAW—APPEAL—MATTERS TO BE RAISED BELOW—JURY.— Where it was not apparent that defendant was ignorant that one who served as a juror participated in the search for the body of deceased after his disappearance, that matter should have been raised on *voir dire* examination, and is not available on appeal.

15. CRIMINAL LAW—TRIAL—COMMENT OF COUNSEL.—As Penal Code of Arizona of 1913, section 1228, gives a defendant husband an absolute right to call his wife as a witness when he is charged with homicide, the state's attorney may comment on the failure of defendant to call his wife.

[As to *corpus delicti,* see note in 97 Am. St. Rep. 785.]

APPEAL from a judgment of the Superior Court of the county of Maricopa. George H. Crosby, Jr., Judge. Affirmed.

Mr. H. W. Clark, for Appellant.

Mr. Wiley E. Jones, Attorney General, Mr. F. J. K. Mc-Bride, Mr. Clyde M. Gandy, and Mr. L. B. Whitney, Assistant Attorneys General, and Mr. L. M. Laney, County Attorney, for the State.

PATTEE, Superior Judge.—Charged with the murder of one Kenneth C. Falston, the appellant, McCann, was convicted in the superior court of Maricopa county of the crime of murder in the first degree. From the judgment of conviction he appeals to this court.

The evidence on behalf of the prosecution tends to show that Kenneth C. Falston came to the city of Phoenix from the state of Oregon early in October, 1917. He was afflicted with tuberculosis in an advanced stage, and was unable for that reason to engage in any regular employment. Soon after coming to Phoenix, he made the acquaintance of the appellant, McCann, and thereafter the two were much in company. One Ben Falston, a brother of Kenneth C. Falston, came with the latter from Oregon, and soon after reaching Phoenix obtained employment at a ranch some miles from that city. On the morning of November 19, 1917, Kenneth C. Falston and McCann were seen in company at a fire which occurred in Phoenix, and in conversation with a third party, in the presence of McCann, Falston stated that he had sold his automobile to McCann, and that they were about to go about twenty-eight miles in the country to examine another automobile with a view to purchasing it. Falston had on deposit in the Phoenix National Bank a sum of money, and on November 19, 1917, he presented his check for $300 and was paid the amount of the check by that institution. On the afternoon of November 19th, according to the testimony of the witnesses, Falston, in company with McCann, was seen at Scottsdale, Maricopa county. On the 19th of November, Falston disappeared. He did not again appear at the lodging-house where he slept, nor was he seen alive by any person after his appearance at Scottsdale. On November 21st, his disappearance was made a subject of public comment in the press of the city of Phoenix, and on the morning of that day McCann notified his employer and the sheriff of Maricopa county that he believed that Falston had been murdered, for the reason that he

(McCann) had an engagement to meet Falston at 9 o'clock which had not been kept by the latter. The evidence is in conflict as to the time when this statement was made by McCann. The testimony of McCann's employer tended to show that it was before 9 o'clock, and other evidence tended to prove a later hour. McCann then drove to the ranch where the brother of Falston was employed, procured the latter to go with him to Phoenix, and for two days following engaged, or pretended to engage, in a search for Kenneth C. Falston. In the course of that search, at a point some twenty-six miles northeast of Phoenix, there was discovered an overcoat, a muffler and a handkerchief identified as belonging to Kenneth C. Falston. Shortly afterwards McCann was arrested and taken to the office of the county attorney of Maricopa county, where, in answer to questions put by the county attorney and others present, McCann made a lengthy statement concerning his association with Kenneth C. Falston and of the occurrences of November 19th and succeeding days. This statement was taken by a stenographer employed by the county attorney, and subsequently written out in typewriting. Thereafter McCann was brought before a magistrate and was discharged, inferably because the body of Falston had not been discovered.

In April, 1918, the body of a human being was accidentally discovered lying in a wash about twenty-six or twenty-eight miles northeast of Phoenix, and in the general vicinity of Scottsdale. The sheriff was notified, and in company with other officers immediately repaired to the place where the body was discovered, and the body was subsequently removed to an undertaking establishment in the city of Phoenix. When discovered the body was in a condition indicating that it had lain in the position where found for a long time. In the back of the skull there was a wound, evidently a bullet wound, and in the left temple two more wounds of a similar character. While the body was in the undertaking establishment, a portion of the skull was removed by the undertaker, the brain matter, which was in a dried condition, was examined, and from it were removed three bullets, one of one caliber and two of another. Upon the body were found a card showing the registration of Kenneth C. Falston under the Selective Service Draft Act (Act Cong. May 18, 1917, c. 15, 40 Stat. 76 [U. S. Comp. Stats. 1918, §§ 2019a, 2019b, 2044a–2044k]) at the place of his then residence, in the state of Oregon, and other articles

which were identified as belonging to Falston. After the discovery of the body, McCann was again arrested, and his conviction followed. There was also evidence tending to prove that McCann, prior to the 19th of November, was in straitened circumstances, and that soon after that date both he and his wife expended considerable sums of money.

While this is by no means a complete statement of the facts, nor were the above matters established by uncontradicted evidence, it is sufficient for the understanding of the legal questions herein referred to. At the close of the evidence on behalf of the state, and again at the close of all the evidence, the defendant moved the court to direct the jury to return a verdict of not guilty, on the ground that there was not sufficient evidence to show either the *corpus delicti,* or to warrant the submission to the jury the question of whether the accused was guilty of the crime charged. The latter point does not seem to be insisted upon in this court. We have, however, read carefully the voluminous transcript of the testimony, and, while the evidence is wholly circumstantial, it is ample to warrant the conclusion reached by the jury. To undertake to set forth the numerous facts and circumstances tending to prove the guilt of the accused would unduly extend this opinion, and would be of no value in future cases. It suffices to say that a careful reading of the testimony leads to the conclusion that there was abundant evidence to warrant the verdict of the jury in that respect.

It is earnestly insisted that the evidence is insufficient to establish either that the deceased came to his death by criminal means or that the body found as above stated was that of Kenneth C. Falston. We think, however, there was ample evidence to justify the jury in finding against the appellant on both these points. As a common-sense proposition, the finding of the body of a human being at a remote and lonely spot, some distance from any traveled highway, lying upon the ground, with three bullets imbedded in the brain, evidently fired from two different weapons, and one wound in a position where it could not well have been self-inflicted, would justify any person in believing that death resulted from these bullet wounds. Certainly it cannot be said that the jury was not warranted in so finding. The identification of the body found by the brother of the deceased as that of Kenneth C. Falston, together with the registration card and other articles,

also furnished a basis for the finding of the jury that the body so found was that of the person charged in the information to have been murdered.

At the time of his first arrest McCann was taken to the office of the county attorney, and there by that officer and other officers of the law present was questioned concerning his movements at and about the time of the disappearance of Falston and other circumstances surrounding that disappearance. Upon the trial, and as a part of the state's case in chief, witnesses then present testified to the statements made by McCann. The defendant testified in his own behalf, and on cross-examination counsel for the state read to the witness from a transcript of the shorthand notes taken by the stenographer at that time numerous statements claimed to be in conflict with his testimony given upon the direct examination. The defendant denied making some of the statements, and professed a want of recollection as to whether he made others. In rebuttal the state called the stenographer who took the statement, who was permitted to testify that the questions were actually put to McCann and answered by him as stated in the questions put on cross-examination. It is now insisted that this examination was improperly permitted, and that the statements made were necessarily a part of the case in chief, and could not be used for the purpose of impeachment.

It is undoubtedly the rule that statements made by the accused may be shown as a part of the state's principal case, but this in no wise affects the rules pertaining to impeachment of the testimony of the accused, or the extent of the cross-examination to which he may be subjected. It is not claimed that the statements, if made, were not voluntary. The defendant by statute is made subject to cross-examination as any other witness, and a recognized method of impeachment of the testimony of any witness is by showing statements inconsistent with the testimony given upon the trial. The rule in that respect was strictly followed in this case, the foundation being properly laid. The questions put to the witnesses were properly allowed, and the evidence given in rebuttal, tending to show that the witness did make the inconsistent statements set forth in the impeaching questions, was properly admitted. That the state had in its main case the right to prove, and had attempted to prove to some extent such statements, does not limit or affect the extent of the cross-examination.

One Smith was called as a witness, and gave testimony on behalf of the state. Upon cross-examination he was asked if he had been on good terms with the accused recently, to which he answered that he had not, and that the friendship formerly existing between them had ceased. He was then asked if the cause of the estrangement between himself and the accused was not that he had been paying attention to the wife of the accused, to which he gave a negative answer. On redirect examination he was asked by the county attorney to state the reason for the estrangement between himself and the defendant, to which counsel for the defendant objected in this language:

"Now, if the court please, as to any opinion or anything of that kind, I absolutely object."

The objection was overruled and the witness answered:

"Well, my reasons was simply this: That after I had heard and found out all I could about it, I came to the conclusion that it looked like he was guilty of the job, and I told him so, and I told the public so, and he is the man who severed our friendship, not me, after he found out my attitude."

Upon the giving of this answer the defendant's counsel moved to dismiss the jury and call a new venire, on the ground that the defendant's rights had been prejudiced by the expression of opinion by the witness in the answer above quoted. This motion was denied, but the court immediately of his own motion struck out the answer and instructed the jury in emphatic terms that they must disregard entirely the expression of opinion made by the witness. It is now insisted that, notwithstanding the action of the court, the expression of opinion by the witness was prejudicial to such an extent that it could not be cured by such action, and that it was error to deny the application for the discharge of the jury and the summoning of a new venire. The expression of opinion by the witness was, of course, improper and inadmissible. The witness, having testified to an interruption of the friendship formerly existing between himself and the defendant, and the existence of ill feeling between them, might properly be asked on redirect examination the cause of that ill feeling, or by whom the friendship was interrupted, as bearing upon the extent to which such feeling might affect the credibility of the witness. The authorities are conflicting as to whether a witness, who testifies to ill feeling or

bias against a party growing out of a difficulty between them, may give the details of the difficulty upon redirect examination. But for the purpose of explaining away the bias or ill feeling it is proper, without going into detail, to inquire as to its cause. 2 Wigmore on Evidence, § 952. The question put by the county attorney on the redirect examination was therefore proper. The objection that it called for the opinion of the witness was not well founded. There was nothing in the record as it then stood to advise the court that the answer would contain an expression of opinion, and when the answer was given the jury were promptly and emphatically instructed that it was improper, and must be entirely disregarded by them for any purpose. Ordinarily the striking out of improper testimony, coupled with an instruction to the jury to entirely disregard it, cures the error, except in cases where it can readily be seen that the error was so prejudicial as to be incapable of being cured in that manner. Here, however, we think the prompt action of the court in eliminating the objectionable statement and in directing the jury to wholly disregard it brings the case within the general rule as stated in *Hopt* v. *Utah,* 120 U. S. 430, 30 L. Ed. 708, 7 Sup. Ct. Rep. 614:

"But . . . as to the admissibility of the evidence, if it was erroneously admitted, its subsequent withdrawal from the case, with the accompanying instruction, cured the error. It is true, in some instances, there may be such a strong impression made upon the minds of a jury by illegal and improper testimony, that its subsequent withdrawal will not remove the effect caused by its admission; and in that case the original objection may avail on appeal or writ of error. But such instances are exceptional. The trial of a case is not to be suspended, the jury discharged, a new one summoned, and the evidence retaken, when an error in the admission of testimony can be corrected by its withdrawal with proper instructions from the court to disregard it."

The court gave an instruction with respect to the abolition of the distinction between principals and accessories before the fact, embodying in substance section 27, Penal Code of Arizona, of 1913. The case seems wanting in evidence to which such an instruction might be applicable. The only claim in that respect is the possible inference, from the fact that two weapons were apparently used in perpetrating the

homicide, that more than one person might have been concerned in it. Upon the whole evidence, such an inference is too far-fetched, and the case therefore presents nothing which called for the giving of this particular instruction. The instruction, as given, however, was correct as an abstract proposition of law, and it is not apparent how it could have prejudiced the accused. The giving of instructions, though correct as statements of abstract rules of law, but which find no basis in the evidence, is not to be commended. It is technical, but not reversible, error, unless there is reason to believe that some prejudice resulted. In this case the instruction was foreign to anything shown in the evidence, but it is apparent from a reading of the entire record that it could not have prejudiced the defendant or misled the jury. 38 Cyc. 1621, 1622; *Porras* v. *State,* 19 Ariz. 131, 166 Pac. 288.

The court instructed the jury that, if they believed from the evidence that any witness in the case at the time prior to the trial had made voluntary admissions in regard to material issues, and that such admissions were in conflict with the evidence given by such witness at the trial of the case, such conflict might be considered by the jury for the purpose of determining the credibility of the witness and the weight to be given to his evidence. It is urged that this instruction singles out and directs the attention of the jury to the testimony of the defendant, he being the only witness to whom it could apply. This, however, is not strictly correct, since some of the witnesses for the state on cross-examination were asked as to statements made at the preliminary examination claimed to be in conflict with their testimony given at the trial, and in one instance, at least, a witness admitted making a statement at such examination which was not in strict accordance with his testimony given at the trial of the case. It is not claimed that the instruction is otherwise erroneous, and it is apparent that it is a correct statement of the law. It is couched in general terms, and refers to no particular witness, and while, as a matter of caution, it might well have been omitted, it cannot be said that it was error to give it.

At the trial the defendant sought to prove his whereabouts on November 19th, and succeeding days, for the purpose of showing that he could not have been present at the scene of the homicide. The case, therefore, was one calling for an instruction on the law relating to *alibi,* and the court accord-

ingly gave an instruction on that subject. In such instruction the court said:

"The defendant has sought to prove an *alibi* in this case. By an *alibi* is meant that he has sought to prove that he was some place else at the time this crime occurred."

Then follows a correct instruction upon the subject of *alibi*, concluding in this language:

"It is sufficient to justify an acquittal if the evidence upon that point [*alibi*] raises a reasonable doubt of his presence at the time and place of the commission of the crime charged, if you find a crime has been committed, and you will understand, also, that the attempt of the accused to prove an *alibi* does not shift the burden of proof from the prosecution, but that the prosecution is bound to prove his presence beyond a reasonable doubt."

The criticism of this instruction is in the use of the words "sought" and "attempt." It is urged that the effect of the use of these terms is to convey to the minds of the jurors that the defendant has sought, and attempted without success, to establish the *alibi*, and that the instruction also carries with it the statement that the crime charged had been committed. While the language, "at the time this crime occurred," might, if standing alone and unmodified, be subject to condemnation under the decisions of this court in *Lujan* v. *State*, 16 Ariz. 123, 141 Pac. 706, and *Merino* v. *State*, 16 Ariz. 132, 141 Pac. 710, yet the instruction taken as a whole, and in view of the language stated in other instructions, and in the latter part of this instruction, does not amount to a statement that a crime had been committed. Nor does the use of the other expression complained of amount to reversible error. Unquestionably the language used is subject to some criticism, and better chosen expressions might have been adopted; but the criticism of this instruction, as well as others, when the entire charge is considered, comes within the doctrine announced by this court in *Beasley* v. *State, ante,* p. 237, 179 Pac. 647.

Error is assigned to the charge of the court upon the subject of reasonable doubt. The instruction complained of was apparently copied from the one quoted in the opinion of this court in *Rodriquez* v. *Territory,* 14 Ariz. 166, 125 Pac. 878. It was there held that the giving of such an instruction was not error. It is to be regretted, however, that the admonition of this court in *Roberts* v. *State,* 17 Ariz. 159, 149 Pac. 380;

that "safety and uniformity will be best subserved in following the well-established and approved definition in the Webster case" (5 Cush. 295, 320, 52 Am. Dec. 711), has not in all cases been observed.

The court gave the following instruction, which is assigned as error:

"The defendant has served as a witness in his own behalf. The law gives him that right, and in considering the weight and effect to be given to the evidence of the defendant, while you may consider his manner and the probability of his statements, taken in connection with all the evidence in the case, and, if convincing and carrying with it a belief of its truth, act upon it; if not, you have the right to reject it. But this does not mean that you have a right arbitrarily to reject it, and in judging of the defendant, who has testified before you, you are in duty bound to presume that he has spoken the truth, and unless that presumption has been legally repelled his evidence is entitled to full credit."

The matter of giving an instruction with reference to the testimony of the accused in a criminal case has been a subject of consideration by this court and the supreme court of the territory in a number of cases. In two cases, *Halderman* v. *Territory*, 7 Ariz. 120, 60 Pac. 876, and *Prior* v. *Territory*, 11 Ariz. 169, 89 Pac. 412, the giving of such an instruction, although not in the language contained in that given in this case, was approved by the territorial supreme court. Later that court, in *Robertson* v. *Territory*, 13 Ariz. 11, 108 Pac. 217, expressed doubt as to the propriety of giving such instruction, and recommended that its use be discontinued. The question came before this court in *Erickson* v. *State*, 14 Ariz. 253, 127 Pac. 754. In that case it is said:

"Since the adoption of our Constitution, we think we should go further, and hold that such an instruction is not only 'undesirable,' but error. . . . Any instruction that directs the jury's attention particularly to the testimony of the defendant, and authorizes them to consider its comparative weight, with an implication that its value is to be tested by a rule different from the rule applicable to the testimony of any other witness, is certainly a charge 'with respect to matters of fact.' . . . We do not want to be understood as announcing that such instruction would be considered as sufficient ground in

every case for reversing the judgment. . . . But, as such instruction is not the law, the trial courts should never give it.''

In that case, however, the real reason for reversing the judgment was not the giving of such an instruction, but that the facts proven in the case did not bring it within the statute under which the prosecution was brought. Under this decision the instruction given in this case was undoubtedly erroneous. The error, however, consisted in giving any instruction at all upon the subject. The question whether it was prejudicial error, sufficient to warrant a reversal of the judgment, depends on both the language used in the instruction and the facts and circumstances of this particular case. The argument in support of the claim of error is, not that no instruction on the subject ought to have been given, but that the language of the instruction itself is prejudicial to the defendant. It is obvious, from a reading of the instruction, that this position is not well taken. To call the attention of the jury to the testimony of a witness, and to undertake to state a rule by which his testimony is to be considered, and his credibility to be determined, is undoubtedly commenting upon such testimony. But to call the attention of the jury to the testimony of a witness, and to instruct them that they must presume that he has spoken the truth, and that he is entitled to full credit, unless the presumption that he has so spoken is overcome, while a comment upon his testimony, is a favorable comment, and puts the testimony of such a witness in the preferred position of starting with the presumption of its truthfulness, and requiring the contrary to be shown before such presumption is overthrown.

In the light of the evidence in this case, the instruction complained of was more likely to be beneficial than harmful to the defendant. In his own behalf he testified fully respecting the matters to which the evidence on behalf of the state had been directed, denying many things testified to by the state's witnesses, and explaining what were claimed to be incriminating circumstances. He was subjected to an exceptionally skillful and searching cross-examination. In the course of that cross-examination, extract after extract from what purported to be a transcript of his statement made in the office of the county attorney after his first arrest was read to him, and he was asked if he made the statements so read. For a time he denied making the statements embodied in the

questions, or any statement whatever, and later he fell back upon the clumsy evasion, "I don't remember." The matters stated in the impeaching questions put were utterly at variance with his testimony given on direct examination. In rebuttal, the state called a number of witnesses to prove that the statements contained in the transcript were actually made by the defendant, and also called the stenographer, who took them in shorthand, and he testified to the fact that such statements were made, and that the transcript from which they had been read was a correct transcript of his shorthand notes. The testimony tended very strongly to show that, notwithstanding his denial, or claimed lack of recollection, the statements claimed to have been made on the occasion referred to were actually made by the defendant. Ordinarily it is difficult to judge from a written transcript what was the manner and appearance of the witness, and what impression was left upon the hearers by the testimony he gave; but in this case it is easy to see, even from the printed page, that the impression left by the testimony of the defendant must have been distinctly unfavorable to him. In this situation, an instruction that he was presumed to speak truly, and that his testimony must be taken as the truth until it had been overcome, would be calculated rather to benefit the accused, by placing his testimony in a more favorable light than it might otherwise have been regarded, than to injure him by calling attention to the fact that he had testified. The instruction in no sense carried with it any implication that the value of the defendant's testimony was to be tested by a rule different from the rule applicable to the testimony of other witnesses, except more favorably to the testimony of the defendant. So far from disparaging the testimony of the defendant, it expressly placed it in a more favorable light than it was entitled to. Upon the whole record, it cannot be said that the instruction, though it ought not to have been given, operated to the prejudice of the defendant.

Defendant complains that one of the jurors had been a member of a party conducting a search for the body of Falston after his disappearance. There is not a sufficient showing that anything was said or done by the juror which would in any way prejudice him for the trial of the case. But, giving full effect to the claims of the defendant with respect to the conduct of this juror, there is nothing that would disqualify or

render incompetent this particular juror to sit in the trial of the case. Moreover, it does not appear that the defendant did not know the part taken by the juror in the search prior to the commencement of the trial, and no reason appears why he could not have been examined with respect to such matters upon his *voir dire*.

In his closing argument the county attorney commented somewhat vigorously upon the failure of the defendant to call his wife as a witness. It is provided by statute that upon the trial of the husband for certain offenses the wife may become a witness for or against the husband at her own request, and not otherwise. Section 1228, Pen. Code Ariz., 1913. In such cases, the right of the accused to call his wife as a witness in his behalf not being absolute, no unfavorable comment may be made upon his failure to do so. But on a trial upon a charge of murder the right of the accused to call his wife as a witness is absolute and in such case it has been held by this court that "In those cases in which the defendant may use his wife as a witness in his own behalf, and fails to do so, we think his failure to do so is a matter of legitimate adverse comment." *Zumwalt* v. *State*, 16 Ariz. 82, 141 Pac. 710.

The other claims of error have been considered, but they are so obviously without merit as to require no comment.

Finally, counsel for the defendant insists that the entire conduct of the trial by the court below was unfavorable to his client, and that an atmosphere of distinct unfairness on the part of the court pervaded the trial, to the prejudice of the defendant. But no one reading this lengthy record can fail to be impressed with the view that the learned trial court exercised the utmost care, sometimes under circumstances trying to his patience, to see that the rights of the accused were fully protected, and that he in fact received a fair and impartial trial, and that justice was done by the result reached.

Judgment affirmed.

CUNNINGHAM, C. J., and ROSS, J., concur.

Note.—BAKER, J., being disqualified, the remaining members of the court called in SAMUEL L. PATTEE, Judge of the Superior Court of Pima County, to sit with them at the hearing of this case.

On the question of proof of *corpus delicti* in criminal case, see note in 68 L. R. A. 33.