[Criminal No. 616.   Filed April 19, 1926.]

[245 Pac. 356.]

# RAMON ESCOBAR, Appellant, v. STATE, Respondent.

1. HOMICIDE—INFORMATION CHARGING THAT ACCUSED, IN CERTAIN COUNTY ON CERTAIN DAY, MADE ASSAULT ON DECEASED WITH PISTOL, AND SHOT SUCH PISTOL, INFLICTING MORTAL WOUNDS, HELD TO SUFFICIENTLY ALLEGE TIME AND PLACE OF GIVING MORTAL WOUND (PEN. CODE 1913, § 939).—Information charging that accused, in certain county on certain day, made assault on deceased with pistol, and shot such pistol, inflicting mortal wounds, *held* to sufficiently allege time and place of giving mortal wound, in view of Penal Code of 1913, section 939.

2. HOMICIDE — INFORMATION CHARGING THAT ACCUSED DELIBERATELY AND OF PREMEDITATED MALICE ASSAULTED DECEASED, WITH RESULT THAT LATTER DIED, HELD TO CHARGE THAT DEATH WAS CAUSED WITH DELIBERATE AND PREMEDITATED MALICE (PEN. CODE 1913, § 943, SUBDS. 6, 7, AND SECTION 944).—Information charging that accused deliberately and of premeditated malice made assault with deadly weapon on another, as result of which latter died, *held* to charge murder in first degree, since it sufficiently states that death was caused with deliberate and premeditated malice, in view of Penal Code of 1913, section 943, subdivisions 6, 7, and section 944.

3. CRIMINAL LAW—INFORMATION SERVED ON ACCUSED HELD TRUE COPY WITHIN STATUTE, THOUGH LETTER WAS OMITTED FROM NAME OF VICTIM WHICH APPEARED CORRECTLY IN THREE OTHER PLACES (PEN. CODE 1913, § 969).—Service of copy of information on one accused of murder, in which deceased's name appeared in four places, in one of which letter "a" was omitted, *held* to fulfill requirement for service of true copy under Penal Code of 1913, section 969, since clerical errors and mere irregularities will be disregarded if they are not prejudicial.

4. CRIMINAL LAW—ACCUSED COULD NOT OBJECT THAT INFORMATION SERVED ON HIM WAS IMPERFECT, WHERE HE PLEADED NOT GUILTY AFTER DEMURRER, AND ALLOWED JURY TO BE SWORN BEFORE OB-

---

1.   Charging time and place in indictment for homicide, see note in 3 L. R. A. (N. S.) 1019.   See, also, 13 R. C. L. 902–904.

2.   Duty to charge as to reasonable doubt as between different degrees of crime or included offenses, see note in 20 A. L. R. 1258.

4.   See 14 R. C. L. 208.

JECTING.—Where accused demurred to information, and entered plea of not guilty after demurrer was overruled, obtained continuance, and allowed jury to be impaneled and sworn without objecting that information served on him was imperfect, he could not then object.

5. CRIMINAL LAW—FAILURE TO PROVIDE INTERPRETER FOR ONE ACCUSED OF MURDER, WHO DID NOT UNDERSTAND ENGLISH, BUT WAS REPRESENTED BY COUNSEL WHO DID, HELD NOT TO VIOLATE RIGHT TO MEET WITNESSES FACE TO FACE (CONST., ART. 2, § 24).—Failure to provide requested interpreter for one accused of murder, who did not understand English, but was represented by counsel who did, *held* not to violate constitutional right to meet witnesses against him face to face, as provided by Constitution, article 2, section 24.

6. CRIMINAL LAW—WHERE THREE OF FOUR EYE-WITNESSES SPOKE SPANISH IN PROSECUTION FOR MURDER, WHERE ACCUSED UNDERSTOOD SPANISH BUT NOT ENGLISH, FAILURE TO PROVIDE INTERPRETER HELD NOT REVERSIBLE ERROR (CONST., ART. 6, § 22).—Where three of four eye-witnesses spoke Spanish, in prosecution for murder, and accused, who understood Spanish but not English, did not offer any evidence at trial, failure of court to provide interpreter as requested *held* not reversible error, in view of Constitution, article 6, section 22, though Supreme Court will hold that defendant has not had fair and impartial trial, where lack of interpreter hampers defendant in presenting case.

7. CRIMINAL LAW—INSTRUCTION THAT PREMEDITATED MURDER WAS IN FIRST DEGREE, BUT THAT JURY SHOULD RESOLVE REASONABLE DOUBT IN FAVOR OF LESSER DEGREE, HELD NOT TO PRESUME THAT CRIME, IF ANY, WAS FIRST DEGREE MURDER.—In prosecution for murder, instruction that wilful, deliberate and premeditated murder was in first degree, but that jury should resolve reasonable doubt in favor of lesser degree, *held* not to presume that crime, if any, was murder in first degree.

8. HOMICIDE—INSTRUCTION THAT DEFENDANT WAS GUILTY OF MURDER IN SECOND DEGREE, IF UNJUSTIFIABLE KILLING WAS WITHOUT PREMEDITATION, HELD PROPER.—Instruction that defendant was guilty of murder in second degree, if evidence showed beyond reasonable doubt that unjustifiable killing was result of malice suddenly produced and without premeditation or deliberation, *held* proper.

See (1) 30 **C. J.**, p. 91, n. 99, p. 93, n. 40, 41. (2) 30 **C. J.**, p. 114, n. 88, 91. (3) 16 **C. J.**, p. 794, n. 16, 17. (4) 16 **C. J.**, p. 795, n. 30. (5) 16 **C. J.**, p. 837, n. 44 New. (6) 16 **C. J.**, p. 808, n. 43; 17 **C. J.**, p. 368, n. 5. (7) 16 **C. J.**, p. 952, n. 16. (8) 30 **C. J.**, p. 405, n. 4.

APPEAL from a judgment of the Superior Court of the County of Maricopa. M. T. Phelps, Judge. Affirmed.

Mr. T. J. Croaff, Mr. V. L. Hash and Mr. Wm. J. Fellows, for Appellant.

Mr. John W. Murphy, Attorney General, and Mr. Earl Anderson and Mr. Frank J. Duffy, Assistant Attorneys General, for the State.

LOCKWOOD, J. — Ramon Escobar, hereinafter called appellant, was charged in the superior court of Maricopa county with the murder of his wife, Luisa Escobar. He was tried therefor, and the jury returned a verdict of murder in the first degree, fixing the penalty at death, from which conviction he prosecutes this appeal. Appellant offered no evidence at the trial, and the undisputed evidence shows the facts of the homicide to be as follows:

Appellant and his wife, the deceased, had been separated for some time, and the latter had been living with her parents on a ranch near Glendale, Arizona. About November 1st, 1924, however, he returned to her, and they lived together on the ranch with her family until November 22d. On that day appellant had started for Chandler to seek work. When he reached Phoenix, however, he purchased a pistol and some shells, and returned to the ranch. Upon his arrival there he went to the house, and was met by the deceased at the door, where they engaged in what was seemingly a friendly conversation for about two hours, when, without warning, appellant drew the pistol from his pocket and fired three shots at the deceased, from the result of which she died the next day. Immediately after the shooting he fled, losing

30 Ariz.—11

his hat on the way, and some two or three hours later appeared in a pool-hall in Glendale, borrowing a cap from the proprietor, and stating that he had lost his hat in a fight with some boys down the road. He also borrowed fifty cents, and left his pistol as security for the loan. The next afternoon he was found in bed in a lodging-house in Glendale, and was arrested. When taken into custody, he said his name was Escobar, and asked the officer if he was a policeman, and then stated:

"What was did at the Olivas ranch, I did it, and I thought of looking up an officer to surrender to."

The officer asked appellant why he shot deceased, and he replied:

"Many times women are to blame."

When asked what he had done with the gun, he first replied that he threw it away at the ranch, but afterwards admitted that he had left it with the proprietor of the pool-hall. This pistol, when examined, contained one empty chamber and two exploded shells, and an exploded shell found in appellant's coat pocket fitted the same pistol.

There are a number of errors assigned by appellant, which we will consider as seems advisable. The first is that the information does not state a public offense. Leaving out the formal parts, it reads as follows:

"The said Ramon Escobar, on or about the 22d day of November, 1924, and before the filing of this information at and in the county of Maricopa, state of Arizona, did then and there willfully, unlawfully, and feloniously, and of his deliberate and premeditated malice aforethought, make an assault upon one Luisa Escobar, a human being, there being, with a certain pistol, which said pistol he, the said Ramon Escobar, then and there had in his hand and did shoot off and

discharge said pistol at, towards, against, and into the body of her, the said Luisa Escobar, then and there and thereby inflicting in and upon the body of her, the said Luisa Escobar, certain mortal wounds, of which said mortal wounds she, the said Luisa Escobar, in said county and said state and on or about the 23rd day of November, 1924, did die. . . ."

It is urged that this is defective in two particulars: First, that it does not show the time and place of the giving of the mortal wound; and, second, that it does not charge in direct and plain language more than second degree murder, in that it does not state that the appellant did the shooting with deliberate and premeditated malice aforethought. Section 939 of the Penal Code of 1913, reads as follows:

"939. The precise time at which the offense was committed need not be stated in the indictment or information, but it may be alleged to have been committed at any time before the finding or filing thereof, except where the time is a material ingredient in the offense."

We gather from the information that the appellant on or about the twenty-second day of November, 1924, did "then and there" make an assault on deceased with a pistol, and "did shoot off . . . said pistol . . . then and there inflicting . . . certain mortal wounds," as a result of which deceased died on the twenty-third day of November. We think a person of common understanding would gather from this that the pistol which it is alleged inflicted the mortal wounds upon deceased must have been discharged at the time and place of the assault, and that such allegations were sufficient particularity.

The second point, that the information does not charge more than a second degree murder, raises a more serious question. Substantially the claim is this: In order that a murder should be of the first

degree, it must be committed deliberately and with premeditated malice. It is contended an allegation that a person deliberately and of premeditated malice made an assault with a deadly weapon upon another, as a result of which assault the latter died, does not sufficiently state the death to be caused with deliberate and premeditated malice. It is doubtless true that under the common law the information would not be considered sufficient. We, however, have statutory regulations of informations, among which are the following, which we quote from sections 943 and 944 of the Penal Code, *supra*:

"943. The indictment or information is sufficient if it can be understood therefrom: . . .

"(6) That the act or omission charged as the offense is clearly and distinctly set forth in ordinary and concise language, and in such manner as to enable a person of common understanding to know what is intended.

"(7) That the act or omission charged as the offense is stated with such a degree of certainty as to enable the court to pronounce judgment upon a conviction, according to the right of the case."

"944. No indictment or information is insufficient, nor can the trial, judgment or other proceedings thereon be affected, by reason of any defect or imperfection in matter of form which does not tend to the prejudice of a substantial right of the defendant upon its merits."

A somewhat similar situation was under consideration in the case of *Rodriquez* v. *Territory,* 14 Ariz. 166, 125 Pac. 878. Therein the information charged:

"The said Francisco Rodriquez . . . did . . . of his deliberate and premeditated malice aforethought make an assault upon one . . . with a certain pistol, . . . and . . . the said Francisco Rodriquez did . . . of his deliberate and premeditated malice aforethought shoot . . . said pistol . . . at . . . the body . . . of the said . . . and by thus striking the said . . . in-

flicted . . . upon . . . her . . . a mortal wound, of
which said mortal wound she . . . did . . . die. . . ."

In the opinion we stated:

"We do hold that the indictment in this case is
sufficient to enable a person of common understanding
to know what is intended by the language used; and
it would be absurd to hold that, because the indict-
ment does not repeat the words 'willful, deliberate and
premeditated' before every clause in the charge, there-
fore the indictment does not charge murder in the
first degree. . . . From this language no person of
common understanding could be mistaken as to what
charge was intended to be made against the defend-
ant. We do not wish to be understood as approving
the form in which the indictment in this case is
drawn, as the form is very unsatisfactory as a plead-
ing; but . . . we hold that the indictment is sufficient
in form, and does not tend to prejudice any substan-
tial right of the defendant upon the merits of the
case."

In this connection we quote approvingly the lan-
guage of the Supreme Court of California in *People
v. Cronin,* 34 Cal. 191, 208, 209:

"If it is possible for the lawmaking department of
the government, in the face of the conservatism of the
legal profession, which is too often blind, we fear, to
abolish old forms and rules and establish new, it
would seem to have been done by the Legislature of
this state. To this conclusion the profession must
come, and it must search in the provisions of the
statute for the form of an indictment and for the
rules by which its sufficiency is to be determined
rather than in the common law, for such is the will
of the Legislature. The legislation of this state is
undoubtedly an innovation upon the common law, but
it is not for that reason to be condemned without a
trial. An obstinate adherence to custom is more
pernicious than cautious experiment. . . . In our es-
timation it introduces a salutary and much needed re-
form. . . . In the administration of justice, as in all

else, a wise progress is better than blind conservatism. Not yet has it attained its highest perfection, it is to be hoped, much less had it done so a hundred years ago. If it had, then are those who go before wiser than those who come after, the human understanding is not progressive, and mankind learn nothing from the teachings of experience—the mother of all wisdom.''

We conclude that the information sufficiently charges murder in the first degree.

The next objection is that a copy of the information was not served upon the appellant as provided by section 969 of the Penal Code, *supra*. It appears from the record that the copy served upon the appellant inadvertently left out the letter ''a'' in the word ''Luisa'' the first time it appeared in the information, although the ''a'' appeared properly in the other three places where the word ''Luisa'' was used in the succeeding part. We think if it were in any way possible that appellant had been misled by this variation, there might have been some merit in the contention, but it is impossible that he should not have known the true charge, or that the variance was more than a mere clerical irregularity. In 16 C. J. 795, it is stated:

''Although a true copy must be served, clerical errors or mere irregularities will be disregarded if they do not prejudice the accused.''

It further appears, on the arraignment of appellant, and at the time the alleged imperfect copy was served, he demurred to the information, but made no suggestion that he had not been served with a true copy, and, upon the demurrer being overruled, he entered a plea of not guilty, and the case was set for trial for January 29th, 1925. On that date it was continued on appellant's motion to February 3d, and it was not until after the jury had been duly impaneled and sworn

to try the case that the objection was made. We think, even if it had been good, it came too late. *Powell* v. *State*, 74 Ark. 355, 85 S. W. 781.

The next alleged error is that the court refused, on the request of counsel, to provide an interpreter to translate to the appellant the testimony of the English-speaking witnesses appearing against him. The record shows that appellant did not understand English, at least to a sufficient degree to properly comprehend the testimony of such witnesses, and it is urged that the constitutional provision found in our Constitution, article 2, section 24, giving him the right "to meet the witnesses against him face to face," means that he must meet them, not merely physically but in such a manner and under such circumstances that he can understand their testimony and thus be able properly to meet and answer it.

So far as we are able to ascertain, this precise question has only been passed on in three cases. The Supreme Court of Texas, in the case of *Zunago* v. *State*, 63 Tex. Cr. 58, 70, Ann. Cas. 1913D 665, 138 S. W. 713, referring to the Bill of Rights of the Texas Constitution, which on this point reads as follows: "The accused . . . shall be confronted by the witnesses against him"—in passing upon the same contention, says:

"It is further our opinion that this constitutional provision which says that the accused shall be confronted by the witnesses against him, neither by its letter nor its spirit could be construed, under the circumstances of this case, and as shown by this bill of exceptions to be violated, or that the accused was not confronted by his witness on the trial of this case. . . ."

It is true that in otherwise discussing the matter the court stated that a request for an interpreter was

not made at the proper time, and that, if it had been so made, doubtless the court would have granted the request, and therefore it was no error for the trial court to refuse to exclude the testimony of such witnesses on motion. This ruling, however, in no way affects the positive statement of the court that the constitutional provision quoted was not violated by the failure to provide an interpreter.

The kingdom, afterwards the Republic of Hawaii, before its annexation to the United States, had in its Constitution a provision that the accused in a criminal case "shall in all cases have the right to meet the witnesses who are produced against him face to face," and the contention was made in the cases of *King* v. *Ah Har et al.,* 7 Hawaii 319, and *Republic of Hawaii* v. *Yamane,* 12 Hawaii 189, that this constitutional provision included the right to have an opportunity to understand what the witnesses said, that it was a personal right that could not be exercised by counsel, and that it was a right that could not be waived in a capital case. The court in the first cited case said:

"We agree with the contention of the counsel for the defendants that the constitutional right of an accused person 'to meet the witnesses who are produced against him face to face' is not complied with unless he is in some way made to understand their evidence, in order to enable him to avail himself of his further express constitutional right of cross-examining these witnesses, and also to meet their evidence with his own proofs. . . . But if the accused ·has counsel who understands the evidence, whether directly from the witnesses or through an interpreter, the constitutional requirement is complied with, though the accused himself may not understand it. It is to be presumed that counsel will communicate with client. . . ."

We think these cases are ample to dispose of the constitutional question. If, of course, a defendant is not represented by counsel, a reasonable interpretation of the spirit of the Constitution would undoubtedly require that in some manner the facts which are being offered in evidence against him be brought to his knowledge. When, however, as is stated in the Ah Har case, the defendant is represented by competent counsel who understands, either directly or through an official interpreter, every word uttered by the witnesses, we think the constitutional right is preserved. It is the duty of counsel under such circumstances to communicate the evidence to his client, and it is naturally presumed that he has some method of communication, or he could never have occupied the position he does.

Notwithstanding the fact that the constitutional right of a defendant to meet his witnesses face to face is not violated by the failure of the court to furnish a special interpreter to interpret the evidence to him when he does not properly understand it, if he has counsel representing him who does comprehend it, we are nevertheless of the opinion it is the fairer and better way for the court, either of its own motion in a capital case or upon request in one of a lesser degree, to provide such an interpreter, and if in any such case the record indicates a failure to provide an interpreter has in any manner hampered the defendant in presenting his case to the jury, we shall hold a fair and impartial trial has been denied him. In this particular case, however, we cannot see where an interpreter could have been of the slightest avail to appellant. There were three eye-witnesses to the killing who testified in the Spanish language. The only eye-witness testifying in English did not add a single thing to the evidence given by the others. Ap-

pellant was fully apprised by the testimony of the Spanish-speaking witnesses of every fact testified to by the one who spoke English. The only testimony of importance given by any English-speaking witness of facts not also testified to in Spanish was concerning statements made by the appellant after his arrest. These statements consisted, first, of an admission of the actual killing, coupled with an intention to surrender; second, of an exculpatory statement by appellant, that many times women were to blame; and, third, of contradictory statements as to what he did with the pistol. Had appellant offered any evidence tending in the slightest degree to deny the killing or to show any circumstances whatever in justification or excuse thereof, or in mitigation of the penalty, it might be claimed that a failure to understand the testimony of the arresting officer prejudiced him. Under the circumstances of this particular case, however, we cannot see where such testimony was in the slightest degree injurious. On the contrary, if anything, except as to the admission of the killing, a fact testified to in the presence of the appellant by three witnesses who spoke Spanish, and never denied by him, the statements of the officer were rather beneficial than injurious.

Counsel for appellant has cited us to a series of English cases bearing on this question, of which *King* v. *Lee Kun,* 9 B. R. C. 1121, is the leading one. Of course these cases are from jurisdictions which do not have our constitutional provision, and they were necessarily determined on general rules of practice and justice; there being no statute covering the case. In the case cited, the court said:

"We have come to the conclusion that the safer and therefore the wiser course, when the foreigner accused is defended by counsel, is that the evidence

should be interpreted to him except when he or coun-
sel on his behalf express a wish to dispense with
the translation. . . . ''

But, after due consideration, the court, acting under
a provision of the Criminal Appeals Act, very similar
in effect to article 6, section 22, of our Constitution,
held that no substantial miscarriage of justice had
occurred, and affirmed the conviction for murder.

The final objection is somewhat difficult to deter-
mine precisely from the assignment of error and the
argument thereon, but apparently it is that, since any
unlawful killing is presumed to be second degree
murder under our statute in the absence of some ele-
ment which either lowers it to manslaughter, or
raises it to first degree murder, the court in some
manner erred in its instructions upon that point.
The only instructions specifically objected to are those
set forth in the reporter's transcript, lines 4–10,
page 169, and lines 7–15, page 171. The first in-
struction is:

"If you find from the evidence that the murder,
if any, was willful, deliberate, and premeditated,
then your verdict should be that of murder in the first
degree.

"As between the two degrees of the crime, it is
your duty to resolve any reasonable doubt which may
exist in your mind in favor of the defendant and
in favor of the lesser degree of the crime."

Following as it did the general statutory definitions
of murder, we think this was an eminently correct
exposition of the law, nor do we think that it in any
manner presumed the crime, if any, to be murder in
the first degree.

The second instruction objected to is:

"If you find from the evidence beyond a reasonable
doubt that the said Luisa Escobar, the deceased, was
unlawfully, feloniously, and unjustifiably shot and

killed by the defendant, Ramon Escobar, as charged in the information, and that the killing was the result of malice suddenly produced at the time the fatal shot was fired, and was without premeditation or deliberation, then it is your duty to find the defendant guilty of murder in the second degree."

We can see nothing erroneous in this charge.

This concludes the various assignments of error set forth and argued by appellant. Notwithstanding this fact, we have, in view of the gravity of the penalty, examined the entire record and read carefully all the evidence contained in the reporter's transcript and the instructions of the court. Upon the record as submitted to us, we think that no honest jury could have reached any other conclusion than that the killing of Luisa Escobar was a wilful, deliberate, premeditated and malicious murder, without any circumstances whatever of justification, excuse or mitigation being shown at the trial.

Such being the case, and it appearing on the whole record that substantial justice has been done, the judgment of the lower court is affirmed.

McALISTER, C. J., and ROSS, J., concur