[Crim. No. 1520.    Third Appellate District.—November 13, 1936.]

THE PEOPLE, Respondent, v. TOM SMITH, Appellant.

Lovett K. Fraser for Appellant.

U. S. Webb, Attorney-General, and Wilmer W. Morse, Deputy Attorney-General, for Respondent.

PLUMMER, J.—On the 27th day of May, 1936, the district attorney of the county of Lake filed an information in which he accused the defendant of a felony, to wit, child stealing, based on section 278 of the Penal Code. The information alleges that the defendant, on or about the 10th day of May, 1936, in the county of Lake, state of California, did then and there wilfully, unlawfully and maliciously take away a minor child, to wit, Mary Spiers, then and there of the age of thirteen years, with the intent then and there to retain and conceal such child from J. C. Anton who was then and there the probation officer of Lake County, and who was then and there the person having the lawful charge of such child, etc. To this information the defendant pleaded not guilty.

The trial resulted in the conviction of the defendant, and his motion for new trial being denied, an appeal is taken to this court both from the judgment based upon the verdict of the jury and the order denying his motion for a new trial.

The record shows the following facts:

That one D. F. McIntire, the then probation officer of the county of Lake, filed a petition with the clerk of the juvenile court, asking an order of said court declaring Mary Spiers a ward thereof; that thereupon, a hearing was had upon said petition and Mary Spiers, through a purported order of said juvenile court, was adjudged a ward thereof. The order further declared that said ward be placed on probation in the care, custody and control of D. F. McIntire, and to remain in the home of her mother, Estelle Spiers, subject to visitation by D. F. McIntire; thereafter, and on or about the 18th day of April, 1936, J. C. Anton, the successor

to D. F. McIntire, as probation officer of the county of Lake, filed a petition seeking modification of the aforesaid order, and thereafter, on the 2d day of May, 1936, the juvenile court made another order modifying said order of June 18, 1935, to the effect that said ward be committed to the care, custody and control of the probation officer, to be by him placed in the Ursuline Academy at St. Helena, or to be by him placed in some other school or proper home he should determine to be fit and proper; and on the same date a further order was made modifying the order just referred to, to the effect that the welfare of said Mary Spiers required that her custody be taken from her parent, Estelle Spiers; that on the 2d day of May, 1936, the probation officer delivered said Mary Spiers to the Ursuline Academy at St. Helena. On the 3d day of May, 1936, Mary Spiers ran away from the academy, and arrived, first, at the town of St. Helena, at which place she visited her aunt's home, and, thereafter was picked up by another aunt and brought to the town of Middletown, Lake County; that while at St. Helena she sent a telegram to her mother requesting her mother to meet her at St. Helena, and immediately thereafter sent another message to her mother countermanding this telegram. Mary Spiers arrived at Middletown with her aunt at about the hour of 11 o'clock at night, and her mother, in company with a man by the name of Deck, met her; that the mother, Deck and Mary left Middletown and came to Kelseyville, the home of the mother, arriving about midnight; that immediately after arriving in Kelseyville, Mary came up to Findley, a distance of about four miles, where the defendant Tom Smith lived; Mary Spiers got Tom Smith out of bed and asked him to take her away, which he refused to do, but he did go back with her to her home in Kelseyville. The mother, after the arrival of Smith and Mary, said she was going to take Mary down to Buchanan's cabin, four or five miles from her home, to hide Mary out; that on the same evening Mary Spiers' mother got blankets and took Mary down to James Buchanan's cabin, where Mary stayed for one week. It appears that Tom Smith had for several years, along about the first or second week in May, gone down to the town of Chowchilla and worked in the cotton fields, and was contemplating going down there again on or about the 12th day

of May, 1936; that Mary Spiers and her mother asked the defendant Smith to take Mary Spiers with him. The record shows that the defendant, with knowledge of the court's action, and Mary Spiers, left the residence of Estelle Spiers in Kelseyville on the evening of May 10, 1936, Mary Spiers driving Smith's car, Estelle Spiers and Straud Deck going in Mr. Deck's car. They went to Santa Rosa that night and stopped at the home of Estelle Spiers early on the morning of the next day. It appears that they left the home of Estelle Spiers in Kelseyville at about 9:30 P. M. At Santa Rosa Mary kissed her mother goodbye, and she and Tom Smith proceeded in Smith's car to Chowchilla, Mary driving the car. Smith rented a room from a family with which he was acquainted by the name of Hooper, where Mary stayed for about a week and a half. Before leaving Kelseyville Mary had dyed her hair black and had changed her name to Jennette Martin. There is some testimony in the record to the effect that Smith told Mary that she would have to change her name and dye her hair. This testimony is controverted by the defendant, who states that Mary and her mother selected the name of Jennette Martin, by which Mary was to go after she reached Chowchilla. The place where Smith had worked previously, and to which he was going was on a ranch approximately three miles from Chowchilla, the Hooper place being practically the same distance from the town of Chowchilla. After arriving at the Hooper home it appears that the defendant introduced Mary Spiers by the name which she had selected. Her testimony is to the effect that the defendant had nothing to do with the name which she selected; it was found in a magazine by herself. The record also shows that Estelle Spiers and Mary had contemplated going down to Chowchilla but that for some reason or other the mother could not go, and knowing that the defendant was going to Chowchilla, arranged for him to take Mary. There is nothing in the record to indicate that the defendant knew anything about Mary's contemplated running away from the academy, and had no information thereof until she arrived at her home, as hereinbefore stated. The record shows that the defendant had knowledge of the mother taking Mary to the cabin occupied by the Buchanans, and that she remained there approximately a week, or until such time

as he, the defendant, was ready to go to Chowchilla. The fair interpretation of the record is that the defendant consented to take Mary Spiers to Chowchilla for the purpose of aiding in concealing her whereabouts from the probation officer of the county of Lake.

While at the Hoopers near Chowchilla, in Madera County, it appears that Mary Spiers drove the defendant's car about the neighborhood until a breakdown in the car occurred, after which she drove a car belonging to the Hoopers. It further appears from her testimony that the defendant told her that in going about so much, information as to her whereabouts would likely be disclosed. It also appears from the testimony of Mary Spiers that after the defendant's car had broken down, the defendant said to her that when he got a new car, he would take her to Mexico. There is not a word in the record that we have found, other than just as stated herein, that the defendant cautioned Mary Spiers to remain secluded in the home of the Hoopers. The whole record shows that she was free to come and go in the neighborhood. There is nothing in the record, however, to the effect that Mary Spiers did or did not have any means by which she could secure transportation home if she so desired. Upon that question the record appears to be entirely blank. No physical force of any kind was used to induce Mary to remain at the Hoopers, nor is there anything in the record to the effect that the defendant, by persuasion, or otherwise, induced the said Mary Spiers to remain at the home of the Hoopers, or that he persuaded or induced Mary Spiers to accompany him to the Hoopers near the town of Chowchilla in Madera County.

As pointed out in the case of *People* v. *Simmons*, 12 Cal. App. (2d) 329 [55 Pac. (2d) 297], actual concealment and detention are not necessary to constitute the commission of the offense. The opinion in the Simmons case reads as follows: "The Statute does not indicate concealment nor detention. It does contain as an element 'with intent to detain and conceal'. As proof of that element the court will consider the acts and conduct of the parties, together with all the circumstances of the case both before and after the act complained of." (Citing, *People* v. *Black*, 147 Cal. 426 [81 Pac. 1099], *People* v.

*Taylor,* 88 Cal. App. 495 [263 Pac. 560], and *People* v. *Annunzio,* 120 Cal. App. 89 [7 Pac. (2d) 739].)

All the acts and relations of the defendant with the minor from the time of leaving Kelseyville to the time of his arrest constituted proper matters for the jury to consider in determining the intent of the defendant; likewise, the testimony showing that the defendant had taken the minor to a place 225° miles from her home in Lake County, and boarded her out at a place where he was staying three miles from the town of Chowchilla, in the county of Madera. The inaccessibility of the place and the difficulties attendant upon leaving there and returning to her home are likewise conditions proper to be considered. The element of detaining specified in the statute does not necessarily include the idea of force. The word ''detain'' is thus defined in 18 California Jurisprudence, page 978, as follows: '' 'To arrest; to check; to delay; to hinder; to hold or keep in custody; to retard; to restrain from proceeding; to stay; to stop.' The term is susceptible of many shades of meaning. The idea of force or even duress, threat or menace can all be easily excluded and the word still be pregnant of meaning.''

The appellant, relying upon what appears to be the undisputed testimony of Mary Spiers, save as to the illicit relations between the defendant and herself, does not do anything more than raise a conflict as against the other circumstances proper for the jury to consider. We herewith set forth that testimony, and also a few excerpts from the testimony of Mrs. Hooper, as follows:

''Testimony of Mary Spiers: I drove Tom Smith's car from Deck's house to Santa Rosa. My mother and Deck traveled in my mother's car. I drove Mr. Smith's car from Santa Rosa to Chowchilla. I dyed my hair before I left Lake County. Tom Smith told me he was going to Chowchilla on the 12th of May. I stayed with James Buchanan from Sunday until Saturday. Q. At the time you ran away did Mr. Smith know you were going to run away? A. He didn't know I was going to run away. Q. You ran away of your own free will and accord? A. Yes. Q. Mr. Smith didn't ask you to come up there? A. He didn't even know I was any place around. Q. You asked him if he wouldn't go down to the house with you? A. Yes. Q. And you went to Cecil Blower's and he took you up to Kelseyville. A. Yes.

My mother and Mr. Deck saw me dye my hair. Q. You changed your name? A. Yes. I changed my name. Q. You changed your name to Jennette Martin? A. Yes, I changed my name to Jennette Martin. Q. And you wanted him to introduce you as Jennette Martin? A. Yes. Q. *Your testimony at the preliminary examination was not true?* A. *No, it was not.* Q. When you left Santa Rosa you kissed your mother goodbye? A. I did. Q. Did you say you would be home soon? A. I told her I would come back and see her some time. Q. Well, did you say you would come back and see her soon? A. Yes, I did. Q. Did Mr. Smith lock the door at the house? A. No, he didn't lock the door. Q. Well, he was working in the day time? A. Yes, he was. Q. You could have gone when you wanted? A. Yes. Q. When you were there you ran away? A. I didn't run away, I went for a walk. Q. How long were you gone? A. I was gone from about 4 o'clock until about 7 o'clock. Q. And Mr. Smith and Mr. Hooper were all trying to find you? A. Yes. Q. How long have you known Mr. Smith? A. About 8 years. Q. He has always been like a father to you? A. Well, yes. Q. Now you state that you had sexual intercourse one night. What night? A. I don't know, Monday or Tuesday night. Q. Did you holler? A. No, I did not. Q. You didn't squeal or anything? A. No. Q. Did you tell anybody about it the next morning? A. No. Q. When was the first time you told anybody? A. The first time I told anybody was when I was down in Madera in the sheriff's office. Q. Who was present? A. The sheriff and probation officer. Q. You denied it the first time? A. Yes, I did. Q. You told them there was no such thing? A. Yes. Q. Your mother and you were going to take a trip to Chowchilla? A. Yes. Q. She couldn't go because she had too much business to attend to up here; that's why she couldn't go? A. Yes. Q. So you and your mother planned to go to Chowchilla? A. Yes, we were going to go. Q. Now, as you said, you told Mr. Smith to call you Jennette Martin, and introduce you as Jennette Martin, that is a fact? A. Yes.

Testimony of Mrs. Lois Hooper: Q. Mrs. Hooper, Mr. Smith worked in the day time? A. Yes, he worked every day except the first day he fixed up his tent. Q. And Mary Spiers, she stayed there at the house with you? A. Yes.

Q. And did she drive the car some days when he was away? A. Yes, she drove the car most every day."

Appellant, further in his brief, alleges that the decision of this court in the matter of the application for writ of *habeas corpus*, reported in *Re Spiers*, 15 Cal. App. (2d) 487 [59 Pac. (2d) 838], is conclusive and final upon the questions presented here for our consideration. In that case the record upon which Mary Spiers was adjudged a ward of the juvenile court was all before us. In the instant case the transcript is devoid of that record. The decision of this court of course was not pleaded in bar of the action against the defendant, and it could not have been, for the reason that it was rendered subsequent to the conviction of the defendant. However, to save the objection that the juvenile court had no jurisdiction, it would have been necessary for the defendant to introduce the entire record to show that proper notices of the hearing, at which the court entered its order purporting to adjudge Mary Spiers a ward of the juvenile court, were not given. The original order made upon the petition filed by the then probation officer, D. F. McIntire, does appear in the transcript. This order is entirely silent as to any facts indicating whether the requisite notices were or were not given to invest the court with jurisdiction. The only real recitation therein is to the effect that Mary Spiers was personally present in court, represented by counsel. Nothing appears as to whether Mary Spiers did or did not have any living parents, and nothing as to notices being given.

Under such circumstances, and the failure to introduce any proof on the question, the case of *Hahn* v. *Kelly*, 34 Cal. 391 [94 Am. Dec. 742], decided in 1868, and followed in every decision since having to do with the same question, is decisive. It is there held that everything necessary to acquire jurisdiction will be presumed to have been done. The amendatory order upon which the respondent relies need not be considered, because if the original order was shown to be void, the amendatory order would certainly not give it vitality. But basing our decision upon the case of *Hahn* v. *Kelly, supra,* it must be held that the appellant has failed to present anything to this court justifying a holding herein that jurisdiction was wanting in the juvenile court at the time of the making of the order adjudging

Mary Spiers a ward of the court and placing her in the custody and control of its probation officer, D. F. McIntire.

Not having the record of the juvenile court before us in this case, anything which we might say as to whether the decision in the *habeas corpus* case, *supra,* is a bar, would be immaterial. We may add, however, there seems to be a difference as to whether a proceeding in *habeas corpus* is or is not a bar to a subsequent proceeding when the custody of a minor child is involved, than in other proceedings where such an adjudication is not held to be a bar. (13 Cal. Jur. 283; *In re Holt,* 34 Cal. App. 290 [167 Pac. 184].)

The appellant also urges that the court erred in admitting in evidence certain preventive exhibits, there being no testimony that they were used on the person of Mary Spiers. If it be admitted that this was inadmissible testimony, under section 4½ of article VI of the Constitution it would be insufficient to warrant a reversal of the case.

The appellant insists that the court committed reversible error in giving the following instruction to the jury, to wit: "You are further instructed that the offense involved in the charge against the defendant is an offense against the person having lawful charge of such child, and it is immaterial whether the girl, Mary Spiers accompanied the defendant voluntarily or not." There is no merit in the appellant's contention that the foregoing instruction is erroneous. In *People v. Torres,* 48 Cal. App. 606 [192 Pac. 175], a like instruction was approved, and a number of cases are cited in the opinion showing that the authorities are unanimous in upholding the doctrine that the willingness of the minor is immaterial in considering the guilt or innocence of the defendant.

Finally, it is urged that the defendant was convicted upon perjured testimony. The uncontradicted affidavits filed on behalf of the appellant, and used upon his motion for new trial, do indicate that Estelle Spiers, James Buchanan, Cecil Blower and Straud Deck all testified falsely in relation to what was done with the person of Mary Spiers from the time she left the Ursuline Academy until she started for Chowchilla with the defendant. The fact, however, that perjured testimony was given in the case at the time of the trial, does not afford a basis for a reversal of

the judgment. The leading case on the subject of what is called intrinsic fraud, to wit, the giving of perjured testimony at a trial, is that of *Pico* v. *Cohn,* 91 Cal. 129 [25 Pac. 970, 27 Pac. 537, 25 Am. St. Rep. 159, 13 L. R. A. 336], in which it is held, after citing a number of authorities, that judgments should not be reversed on any such grounds, as no judgment would otherwise ever become final. (See, also, *People* v. *Tallmadge,* 114 Cal. 427 [46 Pac. 282]; *People* v. *Lee,* 9 Cal. App. (2d) 99 [48 Pac. (2d) 1003].)

Whatever the rule may be in other states, these cases show that appellate courts will not reverse on the ground of perjured testimony having been given at the trial. At best, those matters are confided to the discretion of the trial court, and unless abuse of that discretion is shown, it will not be interfered with on appeal.

Finding no reversible error in the record, the order and judgment are affirmed.

Pullen, P. J., and Thompson, J., concurred.