[Criminal No. 863. Filed July 5, 1938.]

[81 Pac. (2d) 83.]

MILLARD F. LASATER, Appellant, v. STATE OF ARIZONA, Respondent.

Mr. Marshall W. Haislip and Mr. L. C. McNabb, for Appellant.

Mr. Joe Conway, Attorney General, and Mr. W. E. Polley and Mr. J. M. Johnson, his Assistants, for Respondent.

ROSS, J.—Millard F. Lasater was convicted of second degree murder and he has appealed contending that the evidence is insufficient to support the verdict and that the court's instructions defining second degree murder were erroneous.

■■ The first of these assignments invites a consideration of the evidence, which is largely circumstantial. The defendant makes no complaint of the court's instructions on circumstantial evidence, nor does he complain of being convicted on that kind of evidence. He admits that such evidence is as valid and dependable as direct evidence but he insists that each and every circumstance must be consistent with each other and also consistent with his guilt and that if

any one of the circumstances in the chain is not proved beyond a reasonable doubt, or is inconsistent with his guilt, the verdict ought not to stand.

Ted Harris, described as an oil field worker, was killed on the night of December 7th or the morning of December 8, 1937, in Stanley Botkin's or cabin number two in the Corona Auto Court at 1604 East Washington Street, Phoenix. His body was found at 6 A. M., December 8th, lying between the Botkin and another cabin. His throat was cut, the cut severing the jugular vein, and a trail of blood from where the body lay led back into the Botkin cabin indicating the body had been dragged therefrom.

It is undisputed that Stanley Botkin, a disabled war veteran, and L. J. Lewis, an employee in the Corona Auto Court, were in the former's cabin about midnight of the 7th and that defendant and Harris came to the cabin carrying with them a bottle of wine that they had bought on their way at the Corona bar. At that time there were no marks or bruises on defendant's face and no blood on his clothes. These four were, according to the evidence, quite drunk at that hour and continued drinking together until Botkin and Lewis "passed out." Before this happened they took their shoes off but went to bed in their clothes.

Botkin and Lewis testified that before they went to sleep defendant and Harris were engaged in a warm discussion of their experiences in the oil fields of Oklahoma and Texas, where they had worked with each other some previous time or times.

About 2:30 night watchman Walker heard a commotion in the Botkin cabin and looked through a window thereof and saw defendant and somebody, whom he did not recognize, sparring with or striking at each other.

At 2:51 defendant appeared again at the Corona café bar and, according to the evidence, at this time

his face was bruised and bleeding; his clothes were dirty and were bloody in front. He bought and drank a cup of coffee, called for a taxi, directed the driver to take him to a non-existent street number where he said his mother lived, gave the driver another non-existent address, and after a futile effort to find his mother the driver requested him to pay his fare, which he refused to do. He was taken by the driver to police head-quarters at 3:30 A. M. and booked. He was searched by the police who found on him ten cents and a pocket knife in his right-hand pocket with the large blade open.

On the morning of the 8th soon after Myrtle Gris-wold, the owner of the Corona café came on duty, she espied blood on the sidewalk in front of the Botkin cabin and Harris' body near by and between the Bot-kin and another cabin. She opened the door of the Botkin cabin, turned on a light and saw Lewis and Botkin were asleep; that the covers on their bed at the foot were very bloody; that splotches of blood were on the bed and on the floor, and a puddle in one place, and on the clothes of Botkin and Lewis. She awoke Lewis and Botkin and told them what had happened. They testified that they knew nothing of the killing and only learned of it when told by Myrtle Griswold.

The shoes defendant was wearing the night of the 7th were introduced in evidence and points of the simi-larity of one of the heels to a bloody track on the floor of the Botkin cabin were described by a witness as follows:

"I find that those four circles correspond and the letter S down here corresponds, the portion of an-other letter, a straight line corresponds closely, and this 'big'."

Defendant's defense was an alibi. He admitted he was with the deceased at the Botkin cabin and that he,

Botkin, Lewis and the deceased were drinking together until 11 o'clock on the night of the 7th, at which time, he testified, he went down town on a street car; that he left the deceased in the Corona café and did not see him thereafter. He testified he visited the Avalon Club on South Central Avenue until about 1:30 A. M., when he got a ride to Fourteenth Street with a man in a car; that from that point he walked to Sixteenth or Seventeenth Street on East Washington Street, when he met two men who "slugged" him on the face and nose so that he bled a lot at the nose and from the side of his face; that the reason these men "beat him up" was because he was not able to direct them to a saloon and entertainment house in that neighborhood; that after he was hurt he went to the Corona café and got a taxi.

His story of what took place in the taxi is not only contradictory of the testimony of the taxi driver but is a rambling jumble of absurdities and improbabilities.

It is the probative weight of the proof defendant challenges. For instance, he says the evidence as to the tracks found in the cabin after the homicide "is nothing more than mere conjecture." We haven't the exhibits, as the defendant did not think enough of them to have them sent here, but a careful examination of the testimony of Mr. James F. McDonald, who is an experienced identification officer, satisfies us that he meant to say and did say that the marks on the heel of defendant's shoe correspond exactly with the track in many respects and were not dissimilar in any respect. However, if the evidence with respect to the tracks was entirely eliminated, we still think the other circumstances directly and unerringly point to the defendant as the person who committed the crime. Again, defendant says the knife found on his person when arrested had no blood on it and it should have had if he used it to cut Harris' throat. Defendant was

not caught red-handed in the act but was arrested some two hours later. He had ample opportunity to wash any blood from the knife before he was apprehended.

These and other criticisms of the evidence might very well have been addressed to the jury but have no place here. We are not the triers of the facts and do not undertake to pass upon the weight of the evidence or the credibility of the witnesses. The evidence, aside from the testimony of defendant, is entirely consistent with his guilt and inconsistent with his innocence.

Defendant's counsel have taken from the court's instructions defining murder and its degrees and manslaughter a small portion thereof and assigned it as erroneous. The instruction, with the portion assigned italicized, reads as follows:

"Murder is the unlawful killing of a human being with malice aforethought. Such malice may be express or implied. . . .

"All murder, gentlemen, which is perpetrated by means of poison or laying in wait, or by any other kind of wilful, deliberate and premeditated killing, or which is committed in the perpetration of, or attempt to perpetrate, arson, rape, robbery, burglary or mayhem, is murder of the first degree. All other kinds of murder are of the second degree.

*"Accordingly, the unlawful killing of a human being with malice aforethought, done wilfully and with deliberation and premeditation, is murder of the first degree, and the unlawful killing of a human being with malice aforethought, but without premeditation or premeditation, is murder of the second degree.*

". . . If you find the defendant guilty of murder, your verdict should be that of murder in the second degree unless you find from the evidence superadded to the evidence of the unlawful killing of a human being with malice aforethought, that the killing was deliberate and premeditated, or that it was committed while in the perpetration or attempt to perpetrate some of the crimes enumerated as being murder of the first degree, as hereinabove instructed. . . .

"I further instruct you, gentlemen, that as between the degrees of murder, if you entertain a reasonable doubt, then you should resolve that doubt in favor of the defendant and in favor of the lesser degree, which would be murder of the second degree, and as between murder and manslaughter, if you entertain a reasonable doubt, then you should resolve that doubt in favor of the defendant and in favor of the lesser degree, which of course would be manslaughter."

■■ Defendant's counsel say that what is wrong with this instruction is that it fails to define second degree murder. They say also that while it gives the statutory definition of that degree, that too is insufficient to inform the jury of the particular elements of the second degree. At common law the crime of murder was the unlawful killing of a human being with malice aforethought. We have adopted that definition of the crime. Section 4583, Rev. Code 1928. Many legislatures, ours among them, were evidently convinced that there could and often did exist different grades of guilt in those taking human life and for that reason passed legislation dividing the offense into first and second degree. These legislatures let the definition of murder at common law stand but provided, as we do by our section 4584, Id., that if murder, that is common law murder, is committed by poisoning or waylaying or torturing or "by any other kind of wilful, deliberate and premeditated killing," that is a killing akin in its cruelty and atrocity to poisoning, etc., or murder committed in the perpetration of, or attempt to perpetrate, arson, rape, robbery, burglary or mayhem, is murder of the first degree. If the murder is committed by none of the ways, means or acts constituting murder in the first degree, it is of the second degree. Thus the definition of first degree murder in a negative way defines and explains second degree murder as the killing of a human being with malice

aforethought, but not with deliberation and premeditation, or by poisoning, etc.

 This court, in *Morgan* v. *Territory,* 7 Ariz. 224, 64 Pac. 421, upheld, as a correct statement of the law, the following instructions:

"If you believe from the evidence, beyond a reasonable doubt, that the said John Duncan was unlawfully, feloniously, and unjustifiably shot and killed by the defendant, as charged in the indictment, and that the killing was the result of malice suddenly produced at the time the fatal shot was fired, and was without premeditation or deliberation, then it is your duty to find the defendant guilty of murder in the second degree" saying: "If, as held by the California court [in *People v. Bealoba,* 17 Cal. 389], it be sufficient to constitute murder of the first degree that the intent to kill be formed upon the instant of killing, this doctrine applies with even greater force in the case of murder of the second degree; for in the former class premeditation and deliberation is required, while in the latter a formed intent at the time of killing only is required."

This same instruction, in effect, was given in *Escobar* v. *State,* 30 Ariz. 159, 245 Pac. 356, and we said (p. 172): "We can see nothing erroneous in this charge."

We think this is and has been a stock instruction in our trial courts for many years. It preserves the statutory definition of murder by requiring malice aforethought in both degrees, but distinguishes one from the other in that in first degree murder there must be deliberation and premeditation and in the second degree it is enough if "the killing was the result of malice suddenly produced at the time" of the killing.

We see no compelling reason why we should not adhere to the rulings of this court in the Morgan and Escobar cases, *supra.*

The judgment of the lower court is affirmed.

McALISTER, C. J., and LOCKWOOD, J., concur.