177 P.2d 376

**STATE v. PUDMAN.**

No. 967.

Supreme Court of Arizona.
Dec. 23, 1946.

On Rehearing Feb. 10, 1947.

Terrence A. Carson, of Phoenix, for appellant.

John L. Sullivan, Atty. Gen., and John W. Rood, Chief Asst. to Atty Gen., of Phoenix, for appellee

MORGAN, Judge.

Defendant was charged with a violation of section 43-3202, A.C.A.1939, commonly referred to as the child stealing statute. He was tried before a jury. At the close of the State's case, a motion for directed verdict on behalf of defendant on the ground of insufficiency of the evidence was made and denied. Defendant offered no evidence. The case was thereupon, after argument and instructions, submitted to the jury which found a verdict of guilty. Motion for new trial was overruled, judgment of conviction entered and sentence imposed, fixing the penalty at confinement in the State Prison for not less than three nor more than five years.

Defendant, on this appeal, for grounds of reversal urges: (1) The insufficiency of the evidence to justify a conviction; (2) prejudicial remarks of the county attorney in argument to the jury; (3) admission of hearsay evidence; and (4) the giving of wrongful and prejudicial instructions.

The facts proved by the state and upon which the verdict and judgment were based, may be stated as follows: The child involved was a little girl of six years, attending the first grade of a Yuma school on Second Avenue, and living with her parents at the Padre Garcia apartments. On the afternoon of January 25, 1946, she returned home from school shortly after 2 o'clock. About 2:30 p. m. she accompanied her father down town, where he bought her an ice cream cone at the drugstore at the corner of Third and Main Streets. The father then instructed the child to go home, and to cross the street by the music store, which is about one and two-thirds of a block from the apartment. The father

left the child who proceeded to comply with his instructions. When she got as far as the music store, she saw a man (the defendant) in a checkered shirt, who told her to come with him and "he would give me a nickel."

She accompanied the defendant across the street to the "Chinaman's" and down to the restaurant called the Cab Hop. At or near that point the defendant asked the child if she wanted to go over to the oil tanks, to which she replied "No". Her testimony is not clear, but apparently they walked near an alley which led to her home, and she told the defendant where she lived. The defendant, however, did not let her go home then. He took the child down past the depot and up to or through some bushes. This appears to be on a path in a vacant lot back of Sanguinetti's. After crossing this lot, they reached the laundry, about a block from the child's home, where he gave her a nickel and told her to go on up town. She went home.

When the little girl reached home, she met a Mrs. Bagby who lived at the Padre Garcia apartments. Mrs. Bagby had seen the child that afternoon when she came home from school and said she was perfectly normal. She saw her again around 3:00. At that time neither her father nor her mother was at home, and Mrs. Bagby testified that the little girl was crying "and was very frightened; she was sobbing." Over objections that any statements made by the child to Mrs. Bagby would be hearsay, which were overruled by the court, Mrs. Bagby gave the following statement:

"She told me that coming home she had gone down with her father to town to get an ice cream cone and that coming home a man had offered her a nickel if she would go for a walk with him and that she—I asked her why she didn't come on home instead of going with the man and she made the reply that the man had held her hand so that she couldn't come home, and that is about all."

The father returned home about 3:15 o'clock. He saw his daughter in Mrs. Bagby's house, and testified that she was in a nervous condition, "shaking and the palms of her hands were wet with sweat. She was not crying, however." The court overruled objections that anything the child said to the father at that time would be hearsay, and the father further testified:

"I asked my daughter where the man had stopped her and she said 'Daddy, I was standing on the corner in front of the music store when this man asked me if I wanted an ice cream cone.' I asked her if she had finished her cone, and she said No, she still had part of it in her hand. I said to her 'Why did you go with this man? Your mother and I have told you not to do those things' and she said he took her by the hand and 'we crossed the street again' which would be 4th Street on the same corner where we lived, and from her recon-

struction of the route he had taken her, they went down on the corner of Maiden Lane to the Cab Hop and she said 'We crossed the street again.' That they had crossed 4th Street again and to the left side of it and continued on down to Gila Street. I said 'Ann, what did you do there?' and she said 'The man asked me if I wanted to go down there and see those gasoline tanks' and then he turned right and went approximately 50 yards down Gila Street, and from that point she could look between two brick apartment buildings and see where we lived—

\*　　\*　　\*　　\*　　\*　　\*

"I asked my daughter why she didn't go home at this point. She said 'Daddy, I was scared.' I said 'Were you crying?' She said 'I was not crying, but big tears was coming down my cheeks.' I said 'Then what did you do?' and she said 'We turned and went back in this direction' which was towards First Street on Gila Street."

There were no visible marks on the little girl indicating she might have been harmed, and both she and her father testified she was not harmed nor injured in any manner. All the streets traversed with the exception of the trail through the bushes across the vacant lot mentioned were public thoroughfares in the city of Yuma. The trail was commonly used. The daughter told her father she was not stopped nor molested in any way in the bushes. The defendant was a stranger to the child and her parents.

The chief of police, Harold B. Breech, testified to the following conversations with the defendant:

"A. I asked him if he had picked up a little girl on Main Street, and he thought a little while and said that he had.

"Q. What else was said? A. He said he thought it was all right to do that.

\*　　\*　　\*　　\*　　\*　　\*

"A. I asked him if he thought it was all right to take a little girl like that and take her off the path to her home, and he said that where he came from it was customary to do that.

\*　　\*　　\*　　\*　　\*　　\*

"A. I asked him where he had taken her to.

\*　　\*　　\*　　\*　　\*　　\*

"A. Well, he was a little confused in his directions of where they had gone to. He didn't know the town and didn't know the streets and he stated that he hadn't taken her very far, only down the street a few blocks and back to where he had gotten her from.

"Q. Did he at any time in that conversation with him assign any reason for taking this child other than that it was customary where he came from? A. He said his intentions was to get her an ice cream soda."

Sheriff Beard testified that the defendant "admitted that he had taken the girl down the street at that time, and the girl was brought in and identified him. She

was very hysterical and scared when she saw the man in my office. She said 'That is the man, don't let him get close to me' and she tried to jerk loose from her father and run out of the room in a hysterical manner, and began to cry."

The first question for our consideration is, do the foregoing facts prove the commission of an offense under section 43-3202, A.C.A.1939, providing: "Every person who maliciously, forcibly or fraudulently takes or entices away any child under the age of seventeen (17) years with intent to detain and conceal such child from its parent, guardian, or other person having the lawful charge of such child, is punishable * * *."

In order to constitute an offense under the terms of the above statute, the taking or enticing of a child must be done maliciously, or forcibly, or fraudulently. Any one of these elements, if accompanied with intent to detain and conceal, would be sufficient. People v. Casagranda, 43 Cal.App. 2d 818, 111 P.2d 672; People v Simmons, 12 Cal.App.2d 329, 55 P.2d 297; People v. Taylor, 88 Cal.App 495, 263 P 560. There is nothing to indicate malice in this case. The jury might have inferred that the taking was forcible from the statement made by the child to Mrs. Bagby. It might also have believed under the circumstances that the offer to give the child a nickel was enticement. Taking the tender age of the child into consideration and giving the testimony every possible intendment in favor of the verdict, we cannot say the proof was insufficient to show a forcible or fraudulent enticement.

Was there any evidence before the jury disclosing on the part of the defendant an "intent to detain and conceal"? In People v. Taylor, supra [88 Cal.App. 495, 263 P. 562], it was said: " * * * In interpreting one's actions for the purpose of determining the intent, it is quite proper, and indeed often necessary, to consider the entire conduct of the individual before and after the particular act which is the subject of scrutiny. 'The intent or intention is manifested by the circumstances connected with the offense, and the sound mind and discretion of the accused. * * *' Section 21, Pen.Code."

We have a similar statutory provision, section 43-111, A.C.A.1939. Actual detention or concealment is not a necessary element of the offense. Under the terms of the statute, the proof need only show the intent to conceal and detain, and all the "Acts and conduct of the parties, together with all the circumstances of the case both before and after the act complained of," will be considered. People v. Simmons, supra [12 Cal.App.2d 329, 55 P.2d 299]; People v. Smith, 17 Cal.App.2d 468, 62 P. 2d 436; People v. Munos, 84 Cal.App. 6, 257 P. 549. The Act involved here was taken from California. The decisions of the courts of that state are highly persuasive.

The evidence is that the defendant was a stranger to the child. He offered her a

nickel to accompany him. His statement is that he was going to buy her an ice cream soda. He did not in fact buy it. When he accosted the girl, she was still eating the double dip ice cream cone her father had purchased for her. Defendant stated to the chief of police that they walked several blocks, but no stops were made at any place where sodas might be procured. Defendant suggested a visit to the oil tanks. From the child's statement and testimony, they passed an alley which led to the child's home. She told the defendant where her home was and testified that the defendant did not let her go home then. She was in emotional stress when she arrived home and, quoting Mrs. Bagby's testimony, "the man had held her hand so that she couldn't come home."

Defendant's explanation of his actions, which we have quoted above, is rather unsatisfactory. His statement as to what his intention was is not borne out by the circumstances. Intent has been defined as a mental attitude shown or made known by the facts. People v. Haxer, 144 Mich. 575, 108 N.W. 90. It is said "'Intent' is the state of mind which precedes or accompanies an act, volition." Crosby v. Wells, 73 N.J.L. 790, 67 A. 295, 302, citing Wigmore Ev., §§ 242, 300. Taking all the circumstances and the testimony to which we have alluded into consideration, we believe that the question as to defendant's intent was for the jury. Unquestionably he enticed the child for some purpose. She was on her way home. The acts of the defendant diverted her from her course home. In that respect she was detained. The element of detaining as used in the statute "Does not necessarily include the idea of force. * * * The term is susceptible of many shades of meaning. The idea of force or even duress, threat or menace can all be easily excluded and the word still be pregnant of meaning." People v. Smith, supra [17 Cal.App.2d 468, 62 P.2d 438].

It may be said that even assuming the evidence satisfies the requirement relating to the intent of detention, is it sufficient to show an intent to conceal? We have already pointed out that neither actual detention nor concealment is essential. It is the intent to detain and conceal which controls, but obviously these elements must be found from acts of the defendant. Without overt acts criminal intent may not be implied. One may have every intention to commit an offense, but unless he does some act necessarily involved in the execution of the offense, rather than a mere act of preparation, it is not an overt act from which criminality may be implied. Black's Law Dict. 3rd Ed.. p. 1310. We think the act of the defendant from which the jury could infer an intent to detain, would be an overt act, sufficient under the rule to support the last element of the offense "conceal". The child evidently had been taken for some blocks. The defendant suggested a further trip to the "oil tanks". As to this phase, the opinion of

the California court, in People v. McGinnis, 55 Cal.App.2d 931, 132 P.2d 30, 32, is persuasive. Therein it was said: " * * * The question of the intention with which the defendant seized and retained possession of the children was a matter for the determination of the jury. Its verdict necessarily infers that the jury believed he took the children with the intention of concealing them from their mother. The common definition of the word 'conceal' is to hide or withdraw from observation; to cover or keep from sight.' It does not necessarily mean that the concealed individual or hidden object may not be located or found by reasonable means of discovery. We cannot say as a matter of law that the defendant did not intend to conceal the children at the time he took possession of them."

Here motion for new trial was presented to the trial court and denied. The trial judge had seen and heard the witnesses. Due consideration must be given to his action which approves the finding of the jury. We cannot pass upon the weight of the evidence nor the credibility of the witnesses. This court is not the trier of the facts. State v. Tuttle, 58 Ariz. 116, 118 P.2d 88; Lasater v. State, 52 Ariz. 366, 81 P.2d 83; Johnson v. State, 33 Ariz. 354, 264 P. 1083. It is only where the evidence and inferences to be drawn from the proven facts fail as a matter of law to justify the verdict and judgment that this court will set aside a verdict on the insufficiency of the evidence, in the absence of impelling reasons, in the interests of justice to do so. Moore v. State, 65 Ariz. 70, 174 P.2d 282.

We cannot pass upon the alleged prejudicial remarks of the county attorney in his argument to the jury. No record of such remarks was made. There is nothing before us for our consideration. Johnson v. State, supra. To challenge the propriety of such remarks, there must be objection and a request made that the jury be instructed to disregard them. Sullivan v. State, 47 Ariz. 224, 55 P.2d 312.

The statements made by the child to Mrs. Bagby and to her father were, as to the former, immediately after the child returned to her home, and as to the latter, within an hour after she had left the defendant. The testimony discloses that when the statements were uttered, the child was nervous and agitated, and were made as a spontaneous and sincere response to the shock. (Keefe v. State, 50 Ariz. 293, 72 P.2d 425) of her experience with defendant. Under the rule established in Soto v. Territory, 12 Ariz. 36, 94 P. 1104, approved in the Keefe case, supra, the statements were admissible. As spontaneous utterances they are considered as part of the res gestae (her experience with defendant), and are expected from the operation of the rule against hearsay. The admission of this testimony was within the discretion of the trial court.

The defendant's claim of error relates to three instructions. It is contended that the

court erred in instructing the jury that the state was not required to prove that the taking was malicious, forcible and fraudulent, but it would be sufficient so far as that element of the offense was concerned to prove that it was either malicious or forcible or fraudulent. What we have said disposes of this claim. The instruction properly stated the law.

The court instructed the jury "that a child is deemed in law to be in her father's custody when she is walking the streets, and if she is wrongfully taken or enticed away, that is deemed to be a taking or enticing away from her father." Defendant urges that the instruction is incomplete and should have been qualified by adding, in substance, if the jury found the defendant guilty beyond a reasonable doubt of the intention to take and detain. The objection is not well taken. The instruction as given merely related to custody and pointed out that a wrongful taking or enticement would be considered away from the father. In other portions of the charge, the court properly instructed as to reasonable doubt, and the elements to be proven to show the commission of the offense. The instructions must be considered as a whole. Macias v. State, 36 Ariz. 140, 283 P. 711.

Defendant complains of the following instruction: "The intent to detain or conceal referred to in the statute does not mean that the party taking the child must intend to hide her in a room or house or to detain or conceal her for any particular length of time. Any intent to detain or conceal a child is within the terms of the statute if the intent exists in the mind of the accused to detain and conceal the child from her parent for any period of time, however short."

On the theory that this authorized the jury to convict either upon an intent to detain or conceal, defendant relies on People v. Black, 147 Cal. 426, 81 P. 1099, which states that the intent must be not only to conceal but also to detain. This is also our view of the law, but we do not read the instruction as authorizing conviction on a finding of one of these elements alone. The instruction advises the jury that any intent to detain or conceal comes within the statute "if the intent exists in the mind of the accused to *detain and conceal* the child from her parent * * *." (Emphasis ours.) We think the jury was fairly instructed that without an intent to both detain and conceal there could be no conviction. In other instructions this was clearly pointed out. In so far as the instruction relates to the place or time of concealment, we have heretofore mentioned that actual detention or concealment need not occur. In addition to the cases cited, see People v. Edenburg, 88 Cal.App. 558, 263 P. 857.

The attorney general calls attention to the fact that the record fails to disclose that any objection was made to the giving of the instructions complained of, and that therefore section 21-1019, A.C.A.1939, is applicable, and that error, if any, has been

waived. This section, in civil cases, prohibits assignments of error growing out of the giving or failure to give instructions unless objection has been made before the jury retires to consider its verdict. It is the position of counsel for the state that under section 44-1811, A.C.A.1939, which provides that the law of evidence and of instructions in civil actions shall apply in criminal actions, section 21-1019 governs, and this court may not pass upon questions pertaining to instructions in the absence of such objections. In view of our holdings as to the propriety of the instructions complained of, any expressions on this phase would be in the nature of obiter dicta.

Before closing, it seems proper to state that the evidence presented was not of a conclusive character. The jury might well have acquitted. Indeed, the testimony of the child at the trial tends to exonerate the defendant. Taking all of the facts and circumstances into consideration, particularly the emotions of the child on her return home, her attitude towards the defendant at the sheriff's office, and the defendant's version as given to the chief of police, we cannot say as a matter of law that the defendant did not intend to detain and conceal the child. The jurors who heard the witnesses, observed the parties and were doubtless familiar with the route over which the child was conducted, and knew the location of the oil tanks, were in the best position to ascertain defendant's intent.

In justice to the defendant it must be said the evidence does show that he voluntarily abandoned the unlawful intent with which the jury found he was possessed. He told the child to go home. This should have been taken into consideration by the court in fixing the sentence. On the record before us, we would have no hesitation in allowing the defendant relief, under the second subdivision of section 44-2537, A.C.A.1939, if the appeal had been taken from the sentence on the ground that it was excessive.

The judgment is affirmed.

STANFORD, C. J., concurs.

LA PRADE, Justice (dissenting).

I cannot concur in the majority opinion for the reason that I am of the opinion that the evidence is insufficient to sustain the judgment of child stealing. The statute defining this offense reads as follows: "43-3202. Stealing or enticing child from parent or guardian.—Every person who maliciously, forcibly or fraudulently takes or entices away any child under the age of seventeen (17) years with intent to detain and conceal such child from its parent, guardian, or other person having the lawful charge of such child, is punishable * * *."

It must be noted that the taking or enticing away must be maliciously, forcibly, or fraudulently accomplished, and in addition

thereto must be accomplished with the specific intent to detain and conceal from the parent. I have read and reread the reporter's transcript of the evidence, consisting of only seventy-two pages. I have figuratively searched it with a fine tooth comb, trying to find therein sufficient evidence to indicate that the taking of the child was maliciously, forcibly, or fraudulently accomplished, with the specific intent to detain and conceal the child from its parents. It must be noted that the intention must be to detain and conceal. To detain means "to hold or keep as in custody; to restrain, especially from proceeding": to conceal means "to hide or withdraw from observation; to cover or keep from sight; to prevent the discovery of." What did this defendant actually do?

To make my position clear I think it is absolutely essential that I orient myself and make it possible for anyone who reads this opinion to orient himself in the city of Yuma and know what course or route the defendant took in walking with the child.

First, the Colorado River at Yuma flows west from the east; all the streets except Main Street run east and west; the avenues run north and south; Main Street runs north and south. The San Carlo Hotel is on the northeast corner of Main and First Streets; the First National Bank at the northwest corner of Second and Main; Sanguinetti's store on the northeast corner of Second and Main; McCallum's Drug Store on the northwest corner of Third and Main; the Catholic church on the southwest corner of Fourth and Main; the music store on the southeast corner of Fourth and Main. The home where this child lived was located on the east side of Main Street about halfway between Fourth and Fifth Streets. The child in question met the defendant in front of the music store at the corner of Fourth and Main. They walked one block east to Gila Street, turned to the right and proceeded a few steps south on Gila, at which time the defendant asked the child if she wanted to go down to see the oil tanks which were located on Gila between Sixth and Seventh Streets. The yard surounding the oil tanks (Union and Texaco) is enclosed by a high barbwire fence. When the child said that she did not want to go down by the tanks, they turned, retraced their steps to the corner, and walked north on Gila toward First Street. They walked one block to Third, a second block to Second Street, passing in front of the Southern Pacific Railroad depot on the east side of Gila Street midway between Second and Third Streets. Arriving at Second Street they continued north to about midway of the block (between First and Second Streets). There at the suggestion of the child—"I told the man I wanted to go out this way because I could get home quicker"—they turned west and crossed through the southeast quarter of the block referred to as the vacant lot in the majority opinion. Across this portion

of the lot there is a well-beaten path running through the bushes mentioned. They did not hesitate nor stop and defendant did not suggest that they get off the path or go into the bushes. This vacant lot is east of the alley running north and south from First to Second Street and is midway between Main and Gila Streets. On arriving at the intersection of the alley and Second Street, they walked south in the alley known as Maiden Lane. Maiden Lane is not a typical alley, but is what might be called a semi-street. There are business buildings and residences on each side of the Lane. They walked south on Maiden Lane to the laundry, which is about halfway between Second and Third Streets, and there the defendant left her. All in all, the defendant walked with the child one block on Fourth Street; two and one-half blocks on Gila Street; practically one-half block through the vacant lot; and one-half block on Maiden Lane. The entire distance traversed was in the business district of the city at approximately two-thirty in the afternoon. With reference to the path across the lot, the chief of police testified that it was commonly used by the residents of the city and that there was nothing unusual in its use by the general public. The child testified that defendant did not touch her other than to hold her hand in crossing the streets. When they arrived at the laundry, he gave her a nickel and told her to go on down town. He did not harm her; he said not one indecent word to her; nor did he make a single indecent or suggestive gesture.

On direct examination the child testified that when she was with defendant she was "scared"; that on some portion of the trip she had tears in her eyes. With reference to this portion of her testimony, the questions and answers on cross-examination were as follows:

"Q. What made you have those tears? A. I don't know.

"Q. The man hadn't hurt you any? A. No.

"Q. He didn't make you scared, did he? A. No.

"Q. Did he scare you at any time while you were with him, Ann? A. No.

"Q. You don't know why you had those tears on your cheeks then, do you? A. No.

\* \* \* \* \* \*

"Q. The laundry was on your way home, wasn't it? A. Yes.

"Q. And he took you up to the laundry and you went on home from there? A. Yes.

"Q. And when was the first time you had tears on your cheeks? Do you remember? A. I don't remember.

"Q. Was it when you got to the laundry? A. I don't remember.

"Q. Did you have tears on your cheeks after you got home? A. I was crying then.

"Q. When? A. When I got home.

"Q. Were you crying when you were over by the laundry? A. I don't think so.

"Q. What made you cry, Ann? A. I don't know.

"Q. Were you afraid of this man? A. No.

"Q. What made you cry then? Can you tell us? If he didn't hurt you and if you were not afraid of him, why did you cry? A. I don't know.

"Q. He didn't frighten you in any way, did he, Ann? A. No."

As indicated in the majority opinion, the testimony of the child was not consistent with and was not corroborated by the hearsay testimony that the court admitted, supposedly being statements that the child made shortly after the occurrence. The testimony of Mrs. Bagby was admitted over objection. The hearsay statements of the child's father were not objected to. The hearsay testimony of Mrs. Bagby was admitted on the theory that the child's remarks to her were spontaneous exclamations induced by mental shock or stress or nervous excitement "Which stills the reflective faculties and removes their control, so that the utterance which then occurs is a spontaneous and sincere response to the actual sensations and perceptions already produced by the external shock.' Since this utterance is made under the immediate and uncontrolled domination of the senses, rather than reason and reflection, and during the brief period when consideration of self-interest could not have been fully brought to bear, the utterance may be taken as expressing the real belief of the speaker as to the facts just observed by him." Keefe v. State of Arizona, 50 Ariz. 293, 72 P.2d 425, 427. It must be remembered that the father testified that he and his wife had over a period of years constantly instructed the child not to walk with strangers. She undoubtedly knew that she had disobeyed her parents. Her statements to Mrs. Bagby were not voluntary. Mrs. Bagby testified that the child made no statements until she questioned her, and that she had to encourage her to talk. The hearsay statements offered by the father were recitations of statements made by the child three hours after the incident. The father testified that when he first took the child to retrace the route taken she was too confused to be helpful, and that he did not again attempt to have her retrace the route until her confusion had subsided and she was able to orient herself and recall clearly the details of the places walked and things seen. It is more probable to believe that if the child was laboring under any stress or excitement it was induced by her sense of guilt at having disobeyed her parents, for she testified positively that she was not "scared" on the trip and that the defendant had done nothing to induce any fright in her. The child was not suffering from any external or nervous shock induced by any conduct of

the defendant. In view of her own testimony with reference to the conduct of the defendant, it is more likely that her nervousness and state of agitation were induced by the cross-examination of her by Mrs. Bagby. This six-year-old child found herself in a squall of unfounded adult furor and indignation, and responded naturally. I think the hearsay testimony should have been excluded. The rule stated in the Keefe case (supra) is applicable to the fact situation here.

 The reasoning of the majority opinion is unfathomable to me especially after the declaration therein contained— "There is nothing to indicate malice in this case." It seems to me that the essence of the offense is the intent to detain and conceal from the parents. The offense is against the parent, not against the child. People v. Gillispie, 104 Cal.App. 765, 286 P. 502. Child stealing is the cruelest and most dastardly offense known to the law. He who intentionally takes or entices away a child with the intent to detain and conceal it from its parents must know that his conduct on discovery will tear out the heart and soul of the mother. Any person guilty of child stealing must possess an abandoned and malignant heart. Yet the majority opinion says "There is nothing to indicate malice in this case."

" 'Malice' and 'maliciously' import a wish to vex, annoy or injure another person, or an intent to do a wrongful act, estab-

lished either by proof or presumption of law." Section 43-103, A.C.A.1939.

"Malice is a wicked and mischievous purpose, which characterizes the perpetration of an injurious act without lawful excuse. State v. Coella, 3 Wash. 99, 28 P. 28, 33." 26 Words and phrases, Perm. Ed., Malice, page 145.

If the defendant was not actuated by malice, then he had no intent to vex, annoy or injure the parents.

 It is said that the intent or intention is manifested by the circumstances connected with the offense, and that it is quite proper and indeed necessary to consider the entire conduct of the individual before and after the particular act subject to the scrutiny. This I have attempted to do. I am not able to discern from any of the evidence in the record, which is presumably the only evidence that was before the jury, any wicked or mischievous purpose on the part of the defendant. One actually guilty of child stealing should be relentlessly pursued and prosecuted; little or no consideration should be given to him.

I think this judgment should be reversed and the case remanded for a new trial. Defendant should be convicted only when the facts demonstrate beyond a reasonable doubt that he is guilty of child stealing, and a conviction should not be dependent upon "giving the testimony every possible intendment in favor of the verdict." (Majority opinion)

210

On Motion for Rehearing

UDALL, Judge.

■ The defendant's petition for rehearing, filed January 16, 1947, of the judgment of this court dated December 23, 1946, affirming his conviction of child stealing, Sec. 43-3202, A.C.A.1939, presents a novel situation. The writer of this opinion, as a new member of the court, was disposed to take no part in the determination of said motion on the theory that the defendant had had "his day in court" both in the trial court and here. However, as my associates pointed out, "his day in court" is not complete until the motion for rehearing is determined. To break the existing deadlock I have therefore carefully examined the entire record and read the cited cases.

In view of the detailed recitation of the facts, as well as the analysis of the statutory and case law appearing in majority and minority opinions heretofore rendered, I fear anything that I might add would be in the nature of supererogation.

The application of our penal statute on child stealing to the facts in this case has given rise to some honest differences of opinion. I fully realize that this court is not the trier of the facts and that this court will only order the rehearing of an appeal, where it appears that probably there was a miscarriage of justice on the former hearing. The four major propositions relied upon in this petition for rehearing were all urged in defendant's opening brief. I see no occasion to consider the alleged improper statements of the County Attorney in his argument to the jury, the admissibility of hearsay evidence, or the correctness of the instructions, for the real crux of the matter is whether the court erred in failing to sustain the defendant's motion for a directed verdict at the close of the State's case, because of the insufficiency of the evidence to warrant a conviction. As to this question, I am fully in accord with the dissenting opinion of Judge LA PRADE and concur in his analysis of both the evidence and the law.

■ In further support of this conclusion these additional comments are submitted. The offense of child stealing is an offense against the parent and not against the child. People v. Gillispie, 104 Cal. App. 765, 286 P. 502; People v. Simmons, 12 Cal.App.2d 329, 55 P.2d 297. It is sufficient for the statutory requirement that the taking or enticing be either malicious, or forcible, or fraudulent. People v. Casagranda, 43 Cal.App.2d 818, 111 P.2d 672. It is immaterial that the child goes voluntarily, People v. Gillispie, supra; People v. Torres, 48 Cal.App. 606, 192 P. 175; People v. Munos, 84 Cal.App. 6, 257 P. 549; People v. Smith, 17 Cal.App.2d 468, 62 P. 2d 436 and the actual length of time that the child is detained is not important. People v. Annunzio, 120 Cal.App. 89, 7 P.2d 739; People v. Kocalis, 140 Cal.App. 566, 35 P.2d 584. There must be both an

intent to detain and an intent to conceal though actual detaining and concealing are unnecessary. People v. Edenburg, 88 Cal. App. 558, 263 P. 657; People v. Simmons, supra. Finally, proof of the intent to detain and conceal must be objective, derived from all the facts and surrounding circumstances of the case both before and after the act charged to be an offense. People v. Black, 147 Cal. 426, 81 P. 1099; People v. Munos, supra; People v. Simmons, supra; People v. Casagranda, supra.

█ Admitting that the defendant's getting the child to walk with him constitues forcible enticement under the terms of the statute, and further admitting that his actions show an intent to detain the child (though this seems highly questionable from the evidence), it seems impossible to find anywhere the exhibition by the defendant of an intent to conceal the child from her parents. The child was never more than four blocks from home on a walk with the defendant, which must, from the evidence, have taken no more than twenty-five to thirty-five minutes during the middle of the afternoon principally over main streets in the town. During this time there is no evidence of one improper move or suggestion or of one improper word spoken.

A man, who intended to conceal a child from its parents, would scarcely go about it in this manner. The defendant knew the location of the child's home, as she pointed it out to him early in the walk. The defendant had no reason to believe that the child's parents might not be walking the same thoroughfares over which he traveled. The only time the defendant left the busy streets was to take a well-traveled short-cut through a vacant lot, no more than one-half block long, and this was suggested by the child. The defendant left the child no more than one block farther from her home than her father had left her earlier in the afternoon.

In People v. McGinnis, 55 Cal.App.2d 931, 132 P.2d 30, 32, the court said: "The common definition of the word 'conceal' is 'to hide or withdraw from observation; to cover or keep from sight.'" None of the defendant's actions exhibit any intent to hide or withdraw the child from observation or keep her out of the sight of her parents.

It is my considered opinion that the flimsy evidence adduced at this trial and the reasonable inferences drawn from the proven facts fail, as a matter of law, to justify the verdict of the jury or the judgment pronounced thereon. None of the reported cases relied upon by the State to support this judgment rested on as weak a factual reed as that shown in this case.

The petition for rehearing is granted and the dissenting opinion of Judge LA PRADE as supplemented by this opinion is now adopted as the judgment of this court. The judgment of the lower court is re-

versed and the cause remanded for a new trial. It is so ordered.

LaPRADE, J., concurs.

STANFORD, Chief Justice (dissenting).

I see no occasion to change my opinion, especially when I read again the testimony which is set forth at greater length in the original opinion written by Judge MORGAN, late of this court.